MERRITT & CHAPMAN DERRICK & WRECKING CO. v.
NORTH GERMAN LLOYD (three cases).

THE SAALE.

(District Court, S. D. New York. June 30, 1902.)

1. SALVAGE—SERVICES IN RAISING BEACHED STEAMSHIPS—NEGLIGENCE.
Where after a vessel, beached while on fire, was raised by a wrecking company under an agreement that the service should be compensated as salvage, she listed and sank again through the insufficiency of the precautions taken by the wrecking company, which was due partly to a reliance on misleading statements made by the owner in respect to her stability, in awarding salvage for the work the additional expense made necessary thereby will be divided between the owner and the wrecking company.

2. SAME—AMOUNT OF AWARD.
The amount earned as salvage by libelant, a wrecking company, in raising and clearing from bodies and wreckage the steamships Bremen, Main, and Saale after they had been beached following the fire on the Hoboken dock where they were partly burned, considered and determined.

3. SAME—SERVICES RENDERED TO BURNING SHIP.
Salvage compensation awarded to tugs for services in beaching the steamship Saale after she had taken fire at her dock at Hoboken, and in assisting in putting out the fire and saving the lives of persons on board.

In Admiralty. Suits to recover for salvage services.

Avery F. Cushman and R. D. Benedict, for Merritt & Chapman Derrick & Wrecking Co. and for the Champion and the Hustler.

Charles L. Guy, for the Eugene Grasselli.

Peter S. Carter, for the Westchester.

James J. Macklin, for the America, the Millard, and the Pulver.

Butler, Notman, Joline & Mynderse, for the Morgan, the De Veaux Powell, and the James D. Leary.

Carpenter & Park, for the McWilliams.

Wing, Putnam & Burlingham, for the Mutual, the Edward M. Timmins, and the Gracie.

John F. Foley, for the Eli B. Conine, the E. J. Kennedy, the M. D. Wheeler, the D. C. Ivins, the M. Moran, the George D. Kuper, and the C. W. Standart.

Shipman, Larocque & Choate, for respondent and claimant and for cargo.

ADAMS, District Judge. These are salvage actions brought by the libellants to recover for services in connection with three steamships, the Bremen, the Main and the Saale, and their cargoes. The necessity for the services arose out of the fire which occurred at the respondent's pier in Hoboken on the 30th day of June, 1900. This fire, with some of its consequences, has been fully described by Judge Brown in the case of The Kaiser Wilhelm der Grosse (D. C.) 106 Fed. 963, and The Bremen, 111 Fed. 228, and The Main, Id., to

¶ 2. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

120 F.—2

which I refer for a general statement of the facts leading up to the present controversies. In those cases, there were awards to various salvors for services to the mentioned vessels. The Kaiser Wilhelm der Grosse was saved from the fire with little damage. The question of salvage in her case was then fully determined. The Bremen and the Main were seriously damaged by fire and it was necessary to beach them, which was done on the Weehawken flats. It remains to be determined what should be awarded as salvage for raising them. The Saale partly drifted and was partly towed down the river and was towed so that she took bottom on the Communipaw flats. Her case has not been heretofore considered in any aspect and it is necessary to determine what should be awarded as salvage for raising her, also what should be awarded for the salvage services of a number of tugs in pumping water on and into her and putting her into the position where the operations for raising her were carried on. These services were somewhat similar in character to those which have already been allowed in the cases of The Bremen and The Main, supra.

In each of the actions covering the Bremen and the Main, an order was made on the 10th of May, 1901, referring it to a commissioner to take evidence and report upon the following questions:

"1. The amount of actual disbursements made by the libellant in performing the service claimed for, including the value of materials reasonably used up or lost in the service.

"2. The amount of the value of the services rendered calculated at a fair and reasonable rate, as upon quantum meruit, without reference to salvage.

"3. The value of the libellant's plant employed in the service, or reasonably necessary therein."

A similar order was made in the action in personam, concerning the Saale, with an additional question, viz.: "The value of the property saved."

It has been agreed by the parties in the action against the Saale, her cargo, &c., that determinations of these questions relating to her, were necessary in such case, and that the method resorted to by the court of obtaining the aid of a commissioner's findings in the action in personam should be effectual in disposing of the questions, so far as they should be applicable, to the action in rem.

In each of the cases, the commissioner has made a report. In the Bremen, he found that he was unable to arrive at definite answers to the 1st and 2nd questions. To the 3rd question, he answered that he found the value of the plant owned by the libellant and used in the service to have been $345,000, and of such as was not owned by it but used more or less, some of it very little, $165,000. In the Main, he found, also, that he was unable to answer the 1st and 2nd questions. To the 3rd question, he answered that he found the value of the plant owned by libellant and used in the service to have been $250,000, and of such as was not owned by it, but used more or less, some of it very little, $163,000. In the Saale, he found, also, that he was unable to answer the 1st and 2nd questions. To the additional question, numbered as the 3rd, he answered that he found the value saved to have been $55,536.27. To the remaining question, numbered

as the 4th, he answered that he found that the value of the plant owned by the libellant and used in the service to have been $187,000 and of such as was not owned by it but used more or less, some of it very little, $145,000.

All the findings with respect to the values of the plant owned by the libellant and used in the service, viz.: $345,000 in the Bremen, $250,000 in the Main, and $187,000 in the Saale, have been excepted to by the respondent and claimant. The exceptions are general and do not point out the particular errors complained of, nor what the findings should have been. The Commander in Chief, 1 Wall. 43, 17 L. Ed. 609. I understand from the brief, however, that the principal complaints are: (1) because the commissioner has reported the values of the same vessels as against the different operations and (2) because he has included certain vessels in the plant, which the exceptant thought were useless, or comparatively so. There can be no doubt that the same plant—or parts of it—was used in the three different transactions, but that would not apparently be a good reason for diminishing the value to a third in each case, unless it appeared that the plant was actually divided into thirds for use at the same time in the different operations, which does not seem to have been the case. The wrecking vessels and appliances were of course shifted around from one sunken, or grounded, vessel to another while the operations were under way, so that perhaps at no one time, were all the elements constituting the plant engaged at work on any one vessel, but there can equally be no doubt that the whole plant was available at proper times for use in the different operations and that such value is the one to be considered, so far as the value may have any effect upon the final question. With respect to the inclusion of the value of the vessels said to have been useless, it has not been shown to me, by references to the testimony, that such was the case. It is not to be expected that a work of this kind could be carried on without some loss of time by a part of the plant or that just the kind of a vessel best adapted for a particular purpose could be supplied at the moment wanted. I am satisfied that the commissioner's findings are correct enough to meet the purposes for which they were designed, that is, to supply the court with a fairly accurate estimate of the value of the plant employed. The exceptions are overruled.

After the disaster, when the fires in the respective vessels had been extinguished and steps for the salvage of the property became necessary, some conversation took place between the representatives of the owners of the steamers and the wrecking company with respect to the latter taking charge of the work, and an agreement was reached and confirmed by letters between the parties as follows:

"New York, July 2nd, 1900.
"Merritt & Chapman Derrick & Wrecking Co., 27 William St., N. Y. City. Gentlemen:—We request you to take sole charge of all the operations on our steamers 'Bremen,' 'Saale' and 'Main' under the direction of our Superintendent, it being understood that if we cannot agree as to compensation for the services rendered, the Board of Underwriters shall act as umpire.
"We are, gentlemen,
"Yours very truly,
"Oelrichs & Co."

"New York, July 2nd, 1900.

"Messrs. Oelrichs & Co., Agents, North German Lloyd S. S. Co., 5 Broadway, New York City. Gentlemen:—

"S. S. 'Saale'—S. S. 'Bremen'—S. S. 'Main.'

"Your favor of even date at hand and contents noted. In answer thereto would say that according to verbal orders which you confirm therein, as to our taking charge of the operations on the above steamers, we are proceeding with the recovery of these ships and their cargoes.

"In reference to any understanding about compensation for our services, we desire to have it understood, whether you choose to consider it Salvage, or day's pay.

"In case of Salvage, our compensation is not to be limited, but decided either by disinterested arbitration, each choosing a representative and they choosing a third, if necessary—or Salvage to be awarded by the Courts.

"We are willing to proceed with the work at day's pay without a bonus, providing such pay is guaranteed to us and we are not obliged to look to the property recovered for it.

"In case you prefer us to look to the property for our compensation, we would expect, in addition to day's pay, a bonus for prompt and successful work; also on account of our taking the chances of values recovered.

"The bonus, in this instance, we are willing to leave to arbitration, either by the Board of Underwriters, or disinterested parties.

"We enclose herewith our schedule of Rates for Plant, &c., by the day.

"We are, gentlemen,
"Yours very truly,
"Merritt & Chapman Derrick & Wrecking Co.
"Isaac E. Chapman,
"Vice-President."

"New York, July 3rd, 1900.

"Merritt & Chapman Derrick & Wrecking Company, 27 William St., City. Gentlemen:—

"S. S. 'Saale'—S. S. 'Bremen'—S. S. 'Main.'

"We beg leave to acknowledge receipt of your valued favor of 2nd instant, and in reply would say that we prefer to treat the services that you may render in the matter of the above three steamers as salvage to be determined in a suit to be brought in the Southern District of New York, unless the amount is arrived at by agreement or arbitration to be hereafter agreed to.

"Trusting that this will be satisfactory, we are, gentlemen,
"Yours very truly,
"Oelrichs & Co."

"July 6, 1900.

"Messrs. Oelrichs & Co., Agents, North German Lloyd S. S. Co., 5 Broadway, City. Gentlemen:—

"S. S. 'Saale'—S. S. 'Bremen'—S. S. 'Main.'

"Answering your favor of July 3rd, we note that you have decided to have us treat the services rendered on the above three steamships as salvage, which is hereby accepted, to be determined by a suit in Admiralty, unless the amount is arrived at by agreement or arbitration, to be hereafter mutually agreed to.

"In reference to your letter of July 2nd, that our operations should be under the directions of your Superintendent, would say that we are pleased to have your Superintendent in touch with the work so our Superintendent can get information about the ships, their cargoes, etc., but should our men in charge think different that he in reference to the operations, we will certainly expect the judgment of our men to prevail.

"Yours truly,
"Merritt & Chapman Derrick & Wrecking Co."

The question of the application of the schedule rates of the wrecking company, mentioned in the letters, has been the subject of con-

siderable discussion in the matter. These rates are the ones often charged by the libellant for wrecking work in the harbor and frequently paid in the absence of a special agreement. It was, however, obviously the intention of the steamship company to avoid committing itself in any way to the schedule rates and to put the matter on a salvage basis, in which the result achieved would be a very material, if not the most important, element to be considered in making the awards. That was the final agreement of the parties and I shall, therefore, give no consideration to the schedule rates, excepting so far as they may have some bearing on quantum meruit in each case to be hereafter determined, as well as possible, as one of the elements in ascertaining a proper salvage award.

Further facts preliminary to the consideration of the awards in detail are not in much dispute. The situations of the vessels, the season of the year and the weather were favorable for the wrecking operations. The vessels were not entirely submerged and no great injury had been done by the fire to their hulls, so as to affect their buoyancy, when relieved of the accumulations of water. Pumping was the principal service to be rendered and to make this effective it was necessary to close all the openings of the vessels, consisting principally of port holes and some coal ports. It was also necessary to clear the rubbish out of them so that the pumps could work to the best advantage, and to remove from the Saale a large number of bodies of persons who had perished in the fire. This was very disagreeable work and in a measure dangerous to health as the weather was very hot at times and the stenches from the bodies and from putrid cargo were almost insufferable. The Main also had some cargo, which as a result of the disaster became spoiled and offensive to handle, with some danger to health. This also had to be removed. The plans of the ships had been burned so that work was carried on at a great disadvantage and experience and care were necessary. Altogether, it was a wrecking operation of unusual magnitude, requiring the use of a special and valuable plant, aided by outside resources, and necessarily to be conducted by experienced and competent persons, but not involving great risk or danger. The result was not much in doubt from the beginning and the wrecking company was reasonably sure of a fair compensation, if its efforts were prudently managed.

After the work was completed, the parties were not able to agree upon the amount of compensation to be paid for the services but the steamship company paid the wrecking company the sum of Forty thousand Dollars on account, for which a receipt was given as follows:

"Received from Messrs. Oelrichs & Co., Agents of the North German Lloyd, the sum of Forty thousand dollars ($40,000) on account of services rendered in the raising of steamships 'Bremen,' 'Main,' and 'Saale,' it being understood, that this account payment in no way prejudices the right of Oelrichs & Co., Agents of the North German Lloyd, to object to the memorandums of days pay and bill of the Merritt & Chapman Derrick & Wrecking Company for the raising of these vessels, or to any item contained in the memorandums and bills.

"New York, September 28, 1900.

"Merritt & Chapman Derrick & Wrecking Co.
"Isaac E. Chapman, Vice Pres."

The steamship company now claims that the sum paid is ample to cover all the services rendered by the wrecking company. The latter claims that quantum meruit in each case would be as follows: the Bremen, $85,299.61 with interest; the Main, $26,479.25, with interest; the Saale, $16,688.72, with interest. It further claims that it is entitled to such sums, with proper additions in view of the salvage character of the contract, from which the $40,000 paid should be deducted.

I will take up the claims in the order first named; also the additional claim for the services of the salving tugs in the last mentioned case.

### THE BREMEN.

The saved value of the vessel was $750,000 and of the cargo $4,800. The vessel was 544 feet long over all and of 10,525 registered tonnage.

The operations commenced shortly after the 30th day of June, the time when the vessel was beached and on the 15th day of July following the vessel was raised and almost in a condition to be delivered to the owner, when an unfortunate accident occurred by which the vessel turned over on her beam ends and it became necessary that the operations should begin anew, with additional appliances, and it was the 1st day of September following when the vessel was finally raised and delivered to the owner. The principal controversy is with respect to this accident, the owner claiming that it happened through the negligence of the wrecking company, in failing to use proper methods, particularly with respect to ballast, and absence of due care, and the latter claiming that it took all the proper precautions, that the accident could not be anticipated and was the result, principally, of reliance placed upon assurances of the agents of the owner that the vessel would not need any ballast.

This vessel was larger than any which had been the subject of wrecking operations within the experience of any of the persons employed in the matter, but they went about it in the way which they had found successful in other cases, by putting a derrick alongside to correct an existing list as the vessel lay sunk and to overcome any which might develop in the raising. The respondent called some witnesses to show that the proper method was to use sand in bags as ballast but their experience was not such as to give their testimony much weight and I conclude that the use of the derrick was proper, particularly in view of the fact that the wrecking company was not assisted in any way by plans of the vessel, owing to their having been burned on board, and that assurances were given by the respondent's agents that ballast was not really needed owing to the stability of the vessel. I do not think, however, that the wrecking company was entitled to rely upon such assurances to the extent of neglecting altogether precautions which are necessary in the raising of any vessel and it is shown by the testimony of one of its experts that all submerged vessels, with a certain amount of water in them, cant one way or the other in leaving the bottom and it is necessary to hold them upright, which is usually done by employing a derrick to be used as a ballast log in one sense, that is in sustaining the vessel on the side to which the derrick may be fastened, and in another

sense to use her as a power, by means of her purchases, to prevent or correct a list either way. It is shown that up to a certain point, varying with the character of the vessel she is working upon, a derrick is ordinarily efficient to prevent any serious careening of the vessel during the raising and I have no doubt that the derrick used here, a powerful vessel, called the Monarch, with a lifting capacity of 260 tons, would have been quite capable, if properly used, of accomplishing that result. When the derrick first went to the Bremen, on the 1st day of July, it was found that the steamship had a considerable list to port, so that that side of the vessel was seven or eight feet lower than the starboard side. The derrick made fast to the port side near the bow and immediately went to work to endeavor to prevent any further list and to straighten the vessel up. To accomplish the latter purpose, wire slings were put in two of the steamer's chocks and fastened to the derrick. A strain was put on the steamer to the extent of about a third of the derrick's lifting power but nothing was accomplished in this way. The next day 1⅞ inch chains were put under the steamer for the purpose of sweeping her bottom, as it is called, and assisting in the lifting. The starboard water ballast tanks, which were empty, were filled and by using the purchases of the derrick on the chains, one of which was fastened on the steamer's foremast and the other on her starboard side and worked around drums on the derrick, the steamer was straightened up to some extent. The derrick then went to other work and returned on the 14th of July. The chains had remained on the steamer and the derrick made fast to them again. The ports were then about closed and the water had been kept down by pumping. Pumping then went on; a strain was put on the chains again by the derrick and shortly afterwards, with the rise of the tide, the steamer left the bottom and rose from her own buoyancy, so that she was five or six feet from the bottom. When she reached this point, about 7 o'clock in the evening of the next day, the steamer careened to port breaking both the chains, by which she was fastened to the derrick, and sunk to the bottom again, where she afterwards straightened up in about the position she first was. Subsequent measures to accomplish the purpose of raising were taken by means of a large quantity of stone ballast, the use of numerous pontoons and the derrick again this time mostly on the starboard side but pursuing substantially the same methods to raise the vessel, excepting the full power of the derrick was used with larger chains. The raising was finally accomplished on the 29th of August. All the work from the 17th of July to such time was the result of the failure to keep the vessel up when first raised. No substantial attempt is made by the wrecking company to account for the first failure. It was suggested in the testimony that the rolling over of the vessel might have been caused by the steamer's bilge keel catching on the sloping bank where she was lying or that her propeller blade might have caught in the mud but neither of the hypotheses seems to me to be tenable, especially as it is fairly established that the vessel was entirely free from the bottom when she turned over. I think it is probable that with an existing list and a great body of moving water

still in the vessel, with a tendency to the port side, and there being no counterbalancing ballast on the starboard side, that shortly after becoming entirely free from the bottom and without any support from it, the natural tendency of the steamship to turn over to the port was too great for the strength of the chains used to maintain her upright position, unless the greatest watchfulness and care should be exercised on the part of those superintending the operation. Expert testimony was taken by the wrecking company to show that when the vessel reached the height where she turned over, that the danger point had been passed but the fact of her turning over is too strong a contradiction of such a theory to permit it being entertained. Assuming that the appliances were reasonably sufficient to prevent the vessel from turning over, res ipsa would seem to condemn the manner of using the appliances. But a conclusion that there was an absence of proper precautions is not dependent upon a presumption. Although it appears from the libellant's testimony that it was usual and proper in operations of this kind to use the steam power of the derrick to check any listing and to keep the vessel upright, and that it was used successfully on the Main when a similar danger menaced her, yet I find no evidence that it was used here, notwithstanding there was warning and ample opportunity to bring it into requisition. When the operations were commenced, a method was devised of showing the extent of the list, and any variation, by means of a swinging bolt fastened to an old sette on the lower promenade deck. This was a primitive arrangement and it would seem that in an important operation of this kind it would have been prudent to use a clinometer for the purpose, as was done in the latter proceedings, but even this rough device, called a "Tell-tale," showed an increasing list some time before the strain was great enough to break the chains. The operation was then in charge of a superintendent, who was on board the steamer. A man left to watch the Tell-tale reported to him that the steamer had started to list, and he shortly went forward and stopped the pumps there. Finding the list still increasing, he stopped all the pumps. This superintendent estimated that there was a lapse of twenty-five minutes between receiving the information and finally stopping all the pumps. I infer that it was about the expiration of this estimated period of time that the chains parted. Thus it appears that considerable time passed, during which the steam power of the derrick might have been used for checking the increasing list and strain upon the chains and no recourse was had to it. The great usefulness of the Monarch in this kind of an operation was her ability to hold and check a listing vessel quickly. Her power and appliances were of course utterly inadequate to prevent a catastrophe of this kind, if they were not exercised diligently. Here, as I must find, the power was not used at all, with the result that the chains were thereby subjected to an undue strain. It is impossible for me to avoid the conclusion that there was negligence on the part of the wrecking company contributing to the wrecking expenses. With this conclusion, I must also find that the negligence of the wrecking company was partly induced by representations on the part of the steamship company that no ballast was needed and in sub-

stance, that not even the derrick would be necessary for the purpose of keeping the steamer upright as she rose from the bottom. Great pressure was being put upon the wrecking company by the steamship company to accomplish the work quickly and this doubtless in a measure led to the absence of precautions which otherwise would have been taken. Altogether, I think it is proper that the usual admiralty method of apportioning the loss in cases of joint negligence should be applied.

The next step is to determine what the damages were. I find in the testimony no satisfactory evidence by which I can, with any degree of accuracy, distinguish between the expenses before and after the first failure and I shall be obliged to consider all expenses, from the beginning to the end, as a part of an entire enterprise. The expenses in this case, as well as in the others which follow, have been the subject of great controversy. As has already been stated, the wrecking company here claims $85,299.61, and interest, as a basis for the salvage award. It claims to have actually expended $17,-137.35 of such amount and that the whole claim is simply what it would have been entitled to for the use of the plant, including the hired part, the payments for which are covered in the said expenditures. The items of disbursements and charges for the plant are attacked in detail by the steamship company in all of the cases. The Commissioner, to whom the matter was referred in aid of the court, was unable to answer the questions concerning these features of the cases and I shall only do it in a general way. I find here that the disbursements were made substantially as claimed but that they should be subjected to reductions, which will let the amount stand, so far as it may be useful, at $16,000. With respect to the remaining claim of $68,162.26 for the use of the wrecking company's plant (making up the claimed quantum meruit $85,299.61), I find that it should be reduced so that it will stand, so far as it may be useful, at $59,000. With an allowance for interest and taking into consideration the saved value, the nature of the service, which entitles the salvor, when the saved value justifies it, to something beyond what would be paid him on quantum meruit and the wrecking company's maintenance of a large and expensive plant especially designed for this kind of business, I think that Ninety-one thousand Dollars ($91,000) will be a reasonable total salvage award on the vessel and cargo. The wrecking company will be allowed one-half of this amount, to be divided between the vessel and cargo in proportion to their relative values.

### THE MAIN.

The value of the vessel saved was $275,000, and of the cargo $14,-096.45. The vessel was about 500 feet long over all and of 10,066 registered tonnage.

The raising operations on her also commenced shortly after the 30th day of June, and they were finished on the 30th day of July, when she was taken to Erie Basin, but she was not then free from cargo and it was necessary to continue operations for that purpose until the 17th day of August. It is contended by the steamship company that all the expense after July 30th should be charged to the

cargo but the circumstances would not justify such a course. The cargo was grain and a great part of it became spoiled and offensive in smell by reason of the sinking. As it was necessary to relieve the ship of the cargo, I must regard that expense as a part of the salvage operation.

The wrecking company claims to have expended on this vessel and cargo $13,922.27. I find no reason to question the payments but I think some part of them might have been avoided by the exercise of economy and, as in the Bremen case, I reduce the amount so that it will stand, so far as it may be useful, at $12,500. There is an additional claim of $12,556.98 for use of the wrecking company's plant (making up the claimed quantum meruit of $26,479.25). I find that it should be reduced so that it will stand, so far as it may be useful, at $10,600. With an allowance for interest and considering the saved value, the nature of the services, the value of the wrecking plant engaged and its maintenance, as in the Bremen, I think that Twenty-seven thousand five hundred Dollars ($27,500) will be a reasonable total salvage award to the wrecking company the vessel and cargo, to be divided between the vessel and cargo in proportion to their relative values.

### THE SAALE.

The value of this vessel before the fire was $300,000. The saved value of the vessel was $55,356.27 and the saved value of the cargo about $41,000. The vessel was 454 feet long over all and of 5,219 registered tonnage.

The first question to be determined is, what award should be made to the wrecking company for its services, and the second question is, what award should be made to the various tugs.

1. The wrecking operations commenced on the 1st day of July and were finished on the 16th day of July. They were of the same general character as those on the other vessels, but somewhat more difficult on account of the necessity of removing more than one hundred bodies of those who had perished in the fire. The cargo saved consisted principally of copper in bars valued at about $33,000, and lubricating oil valued at about $3,900. The remaining value was made up of miscellaneous cargo. The aggregate value of the salving vessels was about $275,000.

The wrecking company claims to have expended on the vessel and cargo the sum of $6,213.37. I think the payments were made but, as in the Main, should be reduced so that the amount will stand, so far as it may be useful, at $5,700. There is an additional claim for the use of the wrecking company's plant of $10,475.35 (making up the claimed quantum meruit of $16,668.72). I think it should be reduced so that it will stand, so far as it may be useful, at $8,800. Having in view the considerations mentioned in connection with the other vessels, I think that Seventeen thousand Dollars ($17,000) will be a reasonable total salvage award to the wrecking company on the vessel and cargo, to be divided between them in proportion to their relative values.

2. Deducting such allowance from the saved total value, it leaves $79,356.27 as a basis for allowances to the tugs. These actions were

consolidated under the title of The S. S. Saale, her cargo, freight, etc.

There is great conflict with respect to these claims. The steamship company contends that practically no services were rendered to the vessel or cargo but that she drifted, excepting so far as assisted by one of the fire boats, upon the flats, and that the tugs made no effort to save life but devoted their attention to the more profitable salvage prizes. On the other hand, it is contended that some of the tugs immediately went to the steamer's assistance as she drifted out from her pier and others shortly joined them and all poured water into her and guided her movements so as to beach her in the best available place, in the meantime directing their best efforts to the saving of life and with some success. This vessel was more exposed than the other vessels to the immediate effect of the fierce flames which broke out on the pier, and she became so enveloped that those on board of her who were fortunate enough to be in a situation to escape, were obliged to quickly abandon her and did so, excepting the captain who remained at his post on the bridge and perished there. The hawsers were first thrown off, however, and she shortly afterwards, through the effect of the wind and the ebb tide, drifted out into the river where the salving vessels went to her assistance. At this time there were a large number of persons confined below. Others who were on the decks jumped into the water, of whom some were saved. I find no reason whatever to believe the charges of inhumanity which have been advanced. The evidence on behalf of the steamship in this respect gives no definite information which would enable the tug men to refute the charges. While it is said, for example, that one of the tugs pulled her hose away when it was being used for the purpose of saving life, for fear it would be spoiled, the name of the tug is not given. The witness who testified to this, said he took no pains to ascertain the name of the tug or of the persons in charge of her. The story is inherently improbable and lacks credible corroboration. The same self laudatory witness said that while he was on board saving life, the tugs did not and would not come near the burning ship, but almost in the same breath he also said that when the fire boat Van Wyck came, she could not get to the ship because of the surrounding tugs and that she only succeeded by threatening to crush them. The evidence clearly shows that the tug men made every reasonable effort to relieve the sufferers who remained in the vessel and took serious chances for that purpose, without regard to any salvage award. Several of the tugs were injured by the heat and suffered loss from the destruction of the hose in use. One of the tugs, the Eugene Grasselli, was the subject of special commendation from the owner of the steamers, in a letter dated August 20th, 1900, directed to the master, James A. Cox, in which the following language was employed:

"We have reported the circumstances attending the saving of life by your vessel on the occasion of the catastrophe by which our piers and steamers in Hoboken were burned on June 30th last, to our Company, and are instructed by them to convey to you, and through you to your crew, their thanks for the prompt and effective aid in rescuing the lives of many men belonging to the steamers and the service of our Company from death by drowning or by fire, and to assure you that the readiness with which you

responded on that occasion, and in the well directed exertions you made for the saving of life, have been fully appreciated by our Company."

This is not a solitary instance of humane and successful work on the part of the tugs. Others were equally solicitous and efficient, with the result that many lives were saved through their efforts. On the question of a salvage award, however, which must be largely determined with reference to the amount of property saved, it is evident that little was accomplished by the tugs towards quenching the fire, excepting so far as their streams of water, assisted towards the end by those of the fire boat Van Wyck, tended to fill and bring about the sinking of the vessel, which finally caused the extinguishment of the interior fire. The flames on deck were kept down and finally subdued by the streams of water played upon them but everything inflammable was substantially consumed. This service was especially valuable in cooling the vessel and passage ways so that a number of the persons imprisoned below were enabled to escape. Probably 33–35 lives were saved in this way. The fire commenced about 4 o'clock and it was not until about 7 o'clock that the vessel was beached. There was no concert of action among the tugs so far as directing the movement of the vessel towards a proper beaching place was concerned, until the tugs Pulver, Millard and America went to her assistance. These tugs were specially employed by the superintendent of the steamship company, after they had assisted in the saving of the Kaiser Wilhelm, because he was familiar with the experience of the masters and crews in handling large vessels. When these tugs reached the vessel, there were numerous other tugs there which had and were rendering helpful aid in filling her with water but at that time she was in a part of the river where there was a depth of from 60 to 75 feet and if she had remained and sunk there, the probability is that the difficulty and expense of raising her would have been so great as to render the saving of any value doubtful. The named tugs, having first played water on the forward bitts of the steamer so as to cool them off, made a hawser fast on them and, going ahead of the steamer, proceeded to tow her towards the flats where they finally beached her in from twenty-six to twenty-eight feet of water. I find that this service was the most effective part of the salvage work but it was only of about an hour's duration.

The services of the remaining tugs can not be very well distinguished from each other. They were of the same general character of pumping water as already described. This is not a case where early arrivals led to such a saving of property that much difference can be made between the salving vessels in that respect. I have considered the saving of life by certain tugs, the values and sizes of the respective salving vessels, their risks, their pumping capacities and use thereof, and the quantity of and general effectiveness of services rendered. The important portion of the work was done between 4:30 and 7 o'clock. After that, there was some, but not an imperative, necessity for the attendance of a few vessels and several remained over night, pumping to some extent, and taking steamship people back and forth. All the services rendered from the beginning

until the wrecking company took charge for the purpose of raising the vessel have been included in a general summary of the matter.

I conclude that a total allowance of Nine thousand Dollars ($9,000) will be a proper compensation to the salving vessels herein to be divided between the vessel and cargo in proportion to their relative values. This amount will be distributed as follows:

| | |
|---|---:|
| Millard | $1,100 00 |
| Pulver | 1,100 00 |
| America | 800 00 |
| Champion | 625 00 |
| Hustler | 325 00 |
| De Veaux Powell | 175 00 |
| James D. Leary | 575 00 |
| D. C. Ivins | 525 00 |
| M. D. Wheeler | 280 00 |
| George D. Kuper | 225 00 |
| M. Moran | 425 00 |
| C. W. Standart | 240 00 |
| Eli B. Conine | 500 00 |
| Eugene Grasselli | 750 00 |
| Mutual | 450 00 |
| Edward M. Timmins | 250 00 |
| Westchester | 120 00 |
| Gracie | 100 00 |
| McWilliams | 315 00 |
| E. J. Kennedy | 120 00 |

In addition I allow the following sums to cover damages received while in the performance of the services: James D. Leary $145; D. C. Ivins $22.50; George D. Kuper $65; M. Moran $75; C. W. Standart $53; McWilliams $25; Emma J. Kennedy $75.

I make no allowance for the claimed service of the Morgan. Testimony was given to show that the master sprang overboard from his boat with a 5 inch hawser and swam therewith a distance of 20 or 30 feet to the stern of the steamer where he took a turn with the hawser around the rudder post and then swam back with the end of the hawser to his own vessel, and, after making the hawser fast, started to tow the steamer down the river. The story is not a very probable one. It is testified by others that when he reached the steamer she was aground but assuming the truth of the account given, it is evident that such proceedings were detrimental rather than helpful. The saving of the steamer was finally accomplished by beaching her and if the Morgan was endeavoring to tow her by the stern down stream, while the leading tugs were endeavoring to swing her around from heading up stream so as to tow her bow on to the flats, the effect of the Morgan's towing was to present the vessel's broadside to the desired place and thus retard the towing. It is also claimed that the Morgan rendered services in pumping but as her capacity was very small—43 gallons per minute as compared with an average capacity of about 400 gallons per minute of the other vessels, excluding the Champion—and the time of the pumping limited to less than an hour, I can not find that she rendered any service for which she should be paid.

One third of the sums allowed for the salvage services is awarded to the masters and crews of the salving vessels, to be divided among

them in proportion to their wages, with a double portion to the master ·in each case, excepting as to the Champion and Hustler. Those vessels were a part of a wrecking plant, in which the crews were paid wages in view of the especial character of their services and are not entitled to participate in salvage awards.

The sum of $40,000, already paid, will be deducted from the allowances to the wrecking company in the first three actions.

Costs will be allowed to the libellant in the first three actions. Disbursements will be allowed to each of the parties recovering in the last action and $10, in lieu of a full docket fee, to those who filed libels before consolidation.