## MURRAY *v.* WHITE and another.

*(District Court, D. Maine. December 5, 1881.)*

1. PUNISHMENT OF SEAMEN.

A subordinate officer is not justified in punishing a seaman for an offence which the master has condoned; and the master is liable, also, if he allows the punishment to be inflicted in his presence.

*Mr. Hale,* for libellant.

*Mr. Hadlock,* for White.

*Mr. Webb,* for Hoffses.

Fox, D. J. The libellant was a seaman on board the ship Lewis Walsh on her late voyage from Liverpool to Portland, and has instituted this action against the master, White, and the mate, Hoffses, to recover damages for personal injuries by him sustained, on the fourth day of August last, from a pistol wound inflicted upon him by the mate in the presence of the master, and with his sanction and approval.

The libel sets forth, with great aggravation, that the libellant was in the mate's watch, and soon after 8 o'clock of the morning in question the watch was set to work scrubbing paint; that the mate put the libellant to work cleaning in front of the cabin; that the master afterwards directed him to clean on the port side near the pin-rail; shortly after, the mate ordered him to go on top of the cabin and clean the bucket-rack; this order was soon countermanded by the master, and the libellant returned to the deck; that the captain told him to go to his work, "you d— s— of a b—," to which he made answer "that he would go to work, but he was not a s— of a b—," when the mate came up, repeating the same profane and vulgar language the captain had used, and thereupon the mate struck him on the side of the head with his clenched fist, again using the same words to him as before; that the mate jumped back and put his hand behind him as though he would draw some instrument from his back pocket, saying, "Now come on, you s— of a b—, come on," and thereupon libellant drew his knife from his sheath and held it down by his side, but so that it might be seen by the mate. This knife, it is alleged, was an old kitchen knife, with a short, broken blade. The mate then ran towards the pin-rail for a belaying-pin, and afterwards got one from the fife-rail, the libellant following him and getting a pin from the pin-rail, after putting his knife down on the rail; that the mate went into the cabin and soon came out with a drawn revolver and club in his hands; went up to libellant, who was then at work in front of the cabin, and struck him with the club on his arm, which he raised to ward off the blow, and threatened to put a bullet through the head of libellant, and while on the deck, where he had fallen by reason of the mate's blow from the club, the mate fired at him, the ball striking in front of the shoulder, and is now lodged near the shoulder-blade.

The captain and mate, in their answers, deny that the libellant was sent upon

the house to clean the bucket-rack, or that any such foul and profane language was at any time spoken to Murray by either of them. The mate alleges that the libellant was directed by the master to do his work better, to which he replied that he would not clean any better for any one, and thereupon the mate ordered libellant to go on with his work and stop his talk, to which libellant answered insolently, and the mate then slapped the libellant on the side of his face, with his open hand, telling him to keep on with his work and have no talk; that libellant immediately drew his sheath knife and came instantly towards the mate, who turned and fled towards the fife-rail, pursued by Murray with his drawn knife, until the mate got a pin from the fife-rail, when Murray turned and took a pin from the pin-rail, and then turned towards the mate with both knife and belaying-pin in his hands; that the captain ordered libellant to put back the pin and go to his work, which he did; that respondent then went into the cabin and took from his trunk a loaded pistol, which had been loaded for a long time; leaving the pin in the cabin, he came out on deck and inquired of Murray if he intended to cut him with that knife; that he said and did nothing more, had no intention of shooting or injuring libellant, but expected that when Murray saw respondent armed and prepared to resist any attack with the knife, he would disclaim any purpose to use the knife upon respondent, and would, without trouble, thenceforth obey the commands and directions of respondent, but that, contrary to his expectations, libellant suddenly and instantly again drew his sheath knife, and with it drawn sprang instantly and threateningly towards the respondent, who sprang back, and finding the libellant still pressing on him with the drawn knife and endangering his life, as he then believed, did then and not till then, for the purpose of protecting himself, raise and fire the pistol at Murray's arm, and not at any vital part, and that the shot took effect in his shoulder; that he did not strike him with a club before firing at him.

The answer of the master is corroborative of the mate's, and alleges that when the mate came out of the cabin he did not anticipate any assault upon libellant by the mate, and that the discharge of the pistol was so quick that he had not time to prevent it.

Besides the libellant, three others of the watch have been produced as witnesses in his behalf; two of them at the time were employed in paint cleaning near to Murray, and the other was at the wheel. These witnesses have for some time been detained in the jail in this city as witnesses for the government, in the prosecution of the mate for this assault, and have had the opportunity of perusing or listening to a written version of these proceedings prepared by Murray, who appears to be a ready penman, and of more than the ordinary intelligence of a common sailor. The statement of these witnesses, in all essential particulars, is but a repetition of Murray's testimony; all agreeing that the foul and profane language was used by both captain and mate, and that the mate came out from the cabin with his pistol and club, and struck Murray with the club on the arm and immediately fired at him.

In addition to the testimony of the respondents, they have examined the second mate, cook, steward, and two passengers. They all deny that any such language was made use of by either of respondents as is charged in the libel; and there is a like conflict with the libellant and his witnesses as to the mate

striking the libellant with a club after he came from the cabin. One of the passengers thinks the mate had a club in his hand, but he is sure that the mate did not strike the libellant with it; and all the other witnesses for respondents assert that when the mate came from the cabin the only thing in either hand was his revolver.

The version of this affair given by libellant and his witnesses is so unreasonable as to demand confirmation, before a court accustomed to listen to the statements of seamen, as to transactions of this description, would be likely to place entire confidence in its correctness. It is hardly credible that, without much greater provocation, both master and mate would pour out such a tirade of vulgarity and profanity upon a sailor, with whom neither of them ever before had the least difficulty, each of them using the same disgraceful epithets; and it is alike incredible that, when the seaman had returned to duty in obedience to the orders of the master, that the mate, without further provocation, would, in the master's presence, so violently assault the seaman with a club, following up the blow by a pistol shot, without any demonstrations on the part of the seaman. After a careful perusal of all the evidence, the court is forced to the conclusion that the testimony in support of the charge is so highly perverted, so exaggerated, and so colors and misrepresents the facts as they occurred, that a court of justice would not be authorized to give credit to it, excepting when it is sustained from other sources.

More than 40 years have elapsed since Judge Story, in *U. S.* v. *Taylor,* 2 Sumn. 584, declared—

"That subordinate officers have no authority to punish a seaman when the master is on board, unless such punishment is absolutely required at the very moment, by the necessity of the ship's service, to compel the performance of duty, and that the master was generally the sole authority, when on board, to authorize punishment to be inflicted on any of the crew; and if he is present when any punishment is inflicted by a subordinate officer, and can prevent it, and does not, he is personally answerable for the act, and by his acquiescence adopts it as done by his authority."

At a much earlier date, Judge Ware, in this district, had in repeated instances enforced these rules in controversies of this description. They commend themselves to every judicial mind as just and reasonable, requiring the master "to exercise his own judgment as to the time, the manner, and the circumstances under which punishment is to be inflicted on the crew for any past misdemeanor, or any present misdemeanor, not immediately and materially affecting the ship's service or security." So far as these rules are found applicable to the facts here established, they must control the judgment of the court.

Upon a revision of all the testimony, the court finds the occurrence to have been substantially as follows:

While the libellant was at work cleaning paint, the master, in a proper manner, directed him to do his work better, to which the seaman made an impertinent reply. Thereupon the mate, without any appeal from the master, came up, told the man to stop talking, and do his work as the captain told him. Instead of complying with this direction, he was insolent to the mate, who thereupon slapped him on the side of his face with his open hand. The libellant then drew his sheath knife, of the usual size, stepping towards the mate, who ran for a belaying-pin, followed by Murray. Each procured a pin, Murray still holding his knife in his hand. The mate then ran into the cabin with the pin to obtain his revolver. He soon after came on deck, with his pistol partly raised and in plain sight, but without any club or pin. After Murray had procured the belaying-pin he was, in the presence of the mate, ordered by the master to put the pin back in its place and return to his work, which he did before the mate went into the cabin. When the mate came from the cabin he went near to the master and up to Murray, who was then quietly at work as ordered, and, with the pistol raised and presented at Murray, inquired of him if he intended to cut him with his knife, which was then in its sheath. Thereupon Murray drew the knife from its sheath, and at the same time the mate fired and wounded the libellant.

Will the law sanction the action of the mate? In the opinion of the court it will not. The libellant's insolent reply to the civil command of the master would have clearly authorized the master to have inflicted reasonable punishment, either by his own hands or by the mate, if the master thought proper so to direct; but no such direction was given, and the mate, without authority from the master, interfered and repeated the master's orders to Murray, who again repeated his insolence; thereupon the mate struck Murray with his open hand in the face. In all probability the blow was of but slight moment, but, as the master was then present, within the rule of law the mate was not authorized to punish the seaman, although he had been insolent and disobedient. There was no immediate exigency of the service which called for such exercise of authority by the mate; and, although Murray deserved punishment for his misconduct, it should have been imposed by direction of the master, who was the proper judge as to the occasion and severity of the punishment, as the misconduct of the seaman had occurred in the presence of the master.

After the blow on the face Murray drew his knife on the mate, stepping forward towards him, who was wholly without means of protection. This act of Murray was an offence of the gravest nature, although in the opinion of the court it was not Murray's design to

strike the mate with the knife unless the mate renewed the assault. When the mate discovered the knife in Murray's hand he was well justified in obtaining a belaying pin with which to defend himself, and Murray was without excuse in pursuing him and procuring a similar weapon. He then had his knife, which was all the means of protection he could need, even if the mate should renew the assault upon him with the pin. Up to the moment when the captain ordered Murray to put down the pin and go to his work, his conduct was wholly without justification or excuse, as the assault upon him by the mate with his open hand would not justify his use of the knife, even if he had reason to suspect that the mate might repeat the blow, as by such a blow no great personal injury could be inflicted, which would alone authorize the use of a deadly instrument in defence. Thus far the libellant was substantially the wrong-doer; but from this stage the court finds the mate's conduct was inexcusable. In his answer he says—

"That the libellant, with the knife in one hand and the belaying-pin in the other, turned towards the respondent, when the captain ordered him to put back the pin and go to his work, which he did, and respondent went at once to his cabin."

The mate thus admits that the libellant had returned to his duty, and the mate, therefore, was without excuse for the subsequent assault on Murray.

The mate is but 22 years of age, and, of course, with no long experience in that capacity. He acknowledges he was greatly excited by Murray's conduct, and well he might be; but after Murray's prompt obedience to the master's command, the mate should have restrained his anger and excitement, and if Murray was deserving of punishment for his misbehavior, as the court most decidedly thinks he was, it should have been imposed by authority of the master, with calmness and deliberation, and in such a manner as to insure obedience from all the crew, and not in the manner adopted by the mate.

When Murray had peaceably returned to his duty, and was at work in obedience to the captain's orders, the mate rushed at him with his pistol raised, inquiring of him "if he intended to cut him with that knife." The knife was not then visible, but at sight of the revolver pointed at him by the mate his knife was drawn by Murray, and at the same time the mate fired and wounded Murray. The mate testifies that in presenting his pistol at Murray "he hoped the sight of it would enforce order." Such an excuse is probably an after-

thought, as there was, when he came from the cabin with his pistol, perfect order and obedience from the libellant, and, so far as is disclosed, from every other seaman on board.

It is claimed that the inquiry made of Murray by the mate, when he presented the pistol, was as to his intentions to use the knife thereafter, and not as to what had been his former purpose. The court is not satisfied that such was the purpose of the inquiry, but, on the contrary, is inclined to the opinion that, when the mate came towards the sailor with his pistol, his purpose was to call him to account for what had already taken place. The witnesses in defence do not all agree exactly as to the precise language of the mate. He says he inquired of him "if he was going to stick the knife in me." The captain states it, "Do you intend to put that knife into me?" The version of the cook and of the steward is that he asked him "if he meant to cut him with the knife." And such is substantially the statement of both the passengers; while the second mate testifies the language was, "You drew a knife on me." The log gives it that the mate inquired of Murray "if he intended to cut him;" and such is the averment in the answer. The language of most of these witnesses, excepting the second mate, with the written statements, is certainly ambiguous, and may admit of either construction; but when the condition of things, as they then were, are taken into consideration, it would seem clear that Murray's future intentions as to the use of the knife would not be a matter of inquiry.

At that moment there was no knife in sight. It was concealed in its sheath, which was under the clothing of Murray; and the seaman, instead of in any way indicating any purpose of renewing the quarrel and using his knife, was in the discharge of the duties to which he had been ordered by the master. The mate, therefore, had no reason whatever to expect further trouble, or that the man would resort to his knife; and had no occasion whatever, therefore, to inquire what the intentions of the libellant might be in the future, while, on the contrary, Murray having just before that drawn the knife when assaulted by the mate, he might well inquire if he had then intended to cut him with that instrument.

The court, therefore, has no doubt that the mate approached Murray, with his pistol raised, ready to fire, with the object of calling him to account for his past misconduct, and this he had no authority to do in the presence of the master, especially as he had been an eye-witness of Murray's behavior, and apparently condoned his misconduct by ordering him back to his duty.

It is argued with great zeal, by the learned counsel for the mate, that he had retreated from the sailor in presence of the crew; that his authority had been set at naught; and that to maintain proper discipline he was justified in what he did; that he had no intent to wound the man prior to his drawing his knife; that his design was, by exposure of the pistol, to let all the crew understand that he was prepared to defend himself, and to maintain his authority; and that he expected Murray would thereupon disclaim any intent to use the knife, and would obey his orders. The testimony does not satisfy the court that such was the motive of the mate; but if it were admitted that such was his object, in the manner he undertook to accomplish it he transcended his authority. He was without directions from the master so to act, and it was for him alone to take the proper measures for maintaining the discipline of his ship. It was not for the mate, after the seaman had returned to his duty, to approach him violently, in a threatening manner, with a loaded pistol presented, and demand of him as to his purposes for the future, unless directed so to do by the master.

Pointing at Murray the loaded pistol, thereby putting him in fear and alarm, was in law an assault. *Regina* v. *St. George*, 9 C. & P. 483. The mate was the aggressor in thus renewing the quarrel, and under the circumstances was not justified in shooting the libellant if he had first drawn his knife from the sheath.

The master answers that everything took place within so short a period of time that he had no opportunity to prevent the mate from making the assault. The master had witnessed the whole transaction; must have seen that the mate was in an excited condition, angry with Murray, when he rushed with the belaying-pin into the cabin. When he came from the cabin the pistol was in plain sight, seen by all the other witnesses, and the court has no question that the captain was aware that the mate had procured it, and that he must have seen it in the mate's hands, as he passed near to the master as he approached Murray. Seeing this deadly weapon presented at the sailor by the mate, which had been obtained by him immediately after the difficulty with Murray, it was the imperative duty of the master to have interfered and ordered the mate to refrain from further violence. If such had been his conduct, there can be but little question that the mate would have obeyed the master's commands and no further trouble would have occurred. Instead of so doing, he abstained from all interference, permitted the mate to rush at the seaman with the dangerous weapon levelled at him, and the master

must in law be held accountable for damages occasioned by the mate's misconduct.

Under all the facts of the case this libellant presents himself as in the outset greatly in the wrong, and he is entitled only to a reasonable indemnity for his expenses, suffering, and loss of time. His wages were paid him to the time of his arrival, although he was not on duty after he was shot, and he has been detained without expense as a witness for the government in the criminal proceedings against the mate, and will receive the usual allowance. It does not appear that he was at any expense for physicians or otherwise. His wound healed shortly after it was inflicted, the ball being lodged in the muscles, so near the surface that the physician called by the libellant testifies that it can be easily removed, the wound healed in a week, and the party entirely cured and ready for duty as a seaman in a month, without doubt; and it is fortunate for all parties that the wound thus inflicted is of so trivial a character.

In *Elwell* v. *Martin*, 1 Ware, 53, the injury sustained by the libellant was more severe than Murray's, there being a dislocation of the arm, which remained in that condition 14 days and was reduced with great suffering and difficulty, and it was in proof that it would be some months before the party could recover the use of his arm, and that it would always remain more liable to such an injury. In that case the libellant had been guilty of misconduct, which in some degree influenced the judgment of the court in awarding the amount of damages, which were fixed at $80. I think that Murray may well be satisfied with a similar amount, and it is so decreed.