**UNITED STATES of America ex rel. Joseph ACCARDI, Relator-Appellant,**

**v.**

**Edward J. SHAUGHNESSY, District Director of the Immigration and Naturalization Service, New York District, Department of Justice, Respondent-Appellee.**

**No. 97, Docket 23191.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 8, 1954.

Decided Jan. 7, 1955.

Writ of Certiorari Granted
March 14, 1955.

See 75 S.Ct. 525.

After the Supreme Court remanded, pursuant to its opinion in United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681, the case went to trial, on a new petition for a writ of habeas corpus before a judge (without a jury). The judge made an order dismissing the writ. From that order relator appeals.

Jack Wasserman, Washington, D. C., (Irving Rader, of counsel, New York, N. Y.), for relator-appellant.

J. Edward Lumbard, New York City (Harold J. Raby and Lester Friedman, New York City, of counsel), for respondent-appellee.

Before CLARK, Chief Judge, and FRANK and HARLAN, Circuit Judges.

FRANK, Circuit Judge.

1. We shall assume familiarity with the facts stated in our previous opinion, 2 Cir., 206 F.2d 897, and in the opinion of the Supreme Court, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681. We do stress one fact: The particular kind of discretionary relief sought by Accardi was suspension of deportation, pursuant to Section 19(c) of the Immigration Act of 1917, as amended in 1948,* which, so far as pertinent, provides:

"In the case of any alien (other than one to whom subsection (d) is applicable) who is deportable under any law of the United States and who has proved good moral character for the preceding five years, the At-torney General may * * * suspend deportation of such alien if he is not ineligible for naturalization or if ineligible, such ineligibility is solely by reason of his race, if he finds (a) that such deportation would result in serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien; or (b) that such alien has resided continuously in the United States for seven years or more and is residing in the United States upon July 1, 1948." 8 U.S.C. (1946 ed. Supp. V) Sec. 155(c).

2. Printed in the Appendix to this opinion are certain "public announcements" of the Attorney General, consisting of newspaper reports of interviews with him and of "press releases" issued by him. They were not called to our attention on the previous appeal. But they were submitted by the government to the Supreme Court. Apparently the Supreme Court took judicial notice of them, since it referred to and relied upon them in its opinion. These data were received in evidence at the subsequent trial and are now in the record before us. They are significant because of the following portions of the Supreme Court's opinion [347 U.S. 260, 74 S.Ct. 503]:

"We think the petition for habeas corpus charges the Attorney General with precisely what the regulations forbid him to do: dictating the Board's decision. The petition alleges that the Attorney General included the name of petitioner in a confidential list of 'unsavory characters' whom he wanted deported; public announcements clearly reveal that the Attorney General did not regard the listing as a mere preliminary to investigation and deportation; to the contrary, those listed were persons whom the Attorney General 'planned to deport.' And, it is alleged, this intention was made quite clear to the Board when the list was circulated among its members. In fact, the Assistant District-

* Now 8 U.S.C.A. § 1254(a) (1).

Attorney characterized it as the 'Attorney General's proscribed list of alien deportees.' To be sure, the petition does not allege that the 'Attorney General ordered the Board to deny discretionary relief to the listed aliens.' It would be naive to expect such a heavy handed way of doing things. \* \* \* If petitioner can prove the allegation, he should receive a new hearing before the Board without the burden of previous proscription by the list. After the recall or cancellation of the list the Board must rule out any consideration thereof and in arriving at its decision exercise its own independent discretion, after a fair hearing, which is nothing more than what the regulations accord petitioner as a right."

3. The government contends that, reasonably construed, those published utterances of the Attorney General could mean no more than that the hearings of persons included in his "program" should be "expedited." The government, explicitly and repeatedly, advanced that same contention in its brief in the Supreme Court.[1] It seems obvious that the Supreme Court rejected it.

4. If more were needed as to the meaning of the Attorney General's statements and "releases," we now have the testimony of the then Attorney General, McGranery, which amply supports the Supreme Court's interpretation.[2] We must take it, then, that the Attorney Gen-

1. The following are excerpts from that brief:

Petitioner's "case rests entirely upon the fact that officials of the Department of Justice have (1) performed their duty to bring deportation proceedings against aliens residing here illegally, (2) *expedited cases* of aliens deemed to be particularly undesirable, (3) believed petitioner to belong to this class, and (4) made public statements describing these activities. \* \* \* "

"There is nothing extraordinary, therefore, in the fact that efforts should be made by the Department of Justice to *expedite proceedings* against deportable aliens whose presence here is deemed particularly undesirable. Nor is it surprising that *public statements* \* \* \* should be made *describing these efforts.*"

Other similar cases "were *expedited* under the Attorney General's program to insure enforcement of the deportation laws against aliens believed to be especially undesirable." (The emphases in the above quotations are added.)

2. The following are excerpts from his deposition testimony:

"Q. Were you the Attorney General of the United States on October 2, 1952? A. Yes.

"Q. Did you hold a press conference in your office in Washington, D.C. on that date? A. I did.

"Q. Does the official press release of the Department of Justice contain the announcement which you made on that date? A. A copy of the release is here, and it does.

"Q. Do the news items of October 3, 1952 in the Washington Star, The Washington Post and the New York Times, accurately reflect your statements to the press? A. They do. \* \* \*

"Q. When Jack Ignatius Dragna was arrested for deportation on December 8, 1952, the official press release of that day by the Department of Justice said: 'The arrest, \* \* \*, was another step in his denaturalization and deportation program deemed at ridding the nation of undesirable aliens engaged in racketeering and other criminal activities.' A. You can underline that 'undesirable aliens.'

"Q. Did the aforesaid quotation accurately reflect your program? A. That is right. That reflects accurately my program. \* \* \*

"Q. At the time of your press conference, according to the newspaper accounts, you had included within your program such persons as Frank Costello, Nicholas Circella, William Lias, Hyman Shomberg, Alfred Polizzi, Harry Voiler and Anthony Volpe. The Government had admitted that Joseph Accardi was within your program. Do you recall whether he was included before or after your announcement of October 2, 1952? A. Joseph Accardi's case was one of the earliest cases submitted, and his case was already on appeal at the time. I think now—if I am incorrect, you correct me—Joseph Accardi's case had been heard by the Hearing Commissioner before and prior to October 2, 1952.

"Q. That is correct. A. But my investigation and the record of Accardi proved him, to my satisfaction, to be racketeer. That is why I put him on there. \* \* \*

"Q. Attorney General Brownell has

eral's clearly stated intention was to deport anyone named by the Attorney General as within his program.

5. We read the Supreme Court's opinion as holding this:

(a) The Attorney General's statements, reported in the press and in his press releases, "clearly reveal that the Attorney General did not regard the listing as a mere preliminary to investigation and deportation," but, "to the contrary," showed that "those listed were persons whom the Attorney General 'planned to deport.'"

(b) Accardi is entitled to a new hearing before the Board—of the kind described by the Supreme Court—if at a trial in the district court he can prove that

(1) he was one of the persons to whom the Attorney General thus referred, and

(2) a majority of the Board knew that fact, and

(3) the majority was affected by it when the Board denied him discretionary relief.

6. The evidence leaves no doubt that Accardi was so named.

7. Was the Board informed of this fact? The trial judge so found, stating: "In accordance with the practice in such cases, notice was given to the Board that Accardi was an alien embraced within the Attorney General's program." He made this finding, despite the oral testimony of the Board's Chairman that, previous to the Board's decision, he had no

such knowledge. As this finding has support in the deposition-testimony of one Board member, and as two other members, also testifying by deposition, said they could not remember whether or not they then had had such knowledge, we see no reason why we should not accept that finding.[3]

8. This leaves but one issue of fact: Was a majority of the Board members influenced by that knowledge? All the Board members testified they were not, because, they said, a notification from the Attorney General that any particular alien was within his "program" meant, to them, merely that the Attorney General desired an expeditious consideration and determination of that alien's case. The trial judge, on the basis of that testimony, found that such was the Board's understanding;[4] and he grounded his decision primarily on that finding, saying that he could see "no rational ground for disbelieving the witnesses" on that score.

This finding, based on that testimony, cannot stand up. We accept it as a fact that the Board members *consciously* believed, when they testified, that the Attorney General's statements amounted to no more than a calendar order (i. e., a direction to give preference, merely in point of time, to consideration and decision of such cases), and that, beyond that, those statements did not have any effect on the Board's decisions. But it is incredible, human nature being what it normally is, that the Attorney General's statements—as interpreted by the Supreme Court and the former Attorney

---

stated in press releases that Joseph Accardi is a racketeer. Do you recall whether he was included within your program because you or your staff considered him to be a racketeer? A. He was one of the first. * * * My investigation of Accardi indicated that he was a racketeer and that is the reason I moved to deport him."

3. The Board consists of five members.

4. His pertinent findings read as follows:
"The purpose of the notification, and it was so understood by the Board, was merely to indicate that the Attorney General desired expeditious consideration and

determination of the appeal. Neither such notification nor the existence of the program was considered by the Chairman or by any Board member as a direction by the Attorney General, or even as a hint by him, to decide an appeal adversely to an alien. Moreover, these matters were given no weight by the Board in their deliberations. * * * The Board members, and each of them who considered Accardi's appeal, reached their individual and collective decision on the merits, free from any dictation or suggestion by the Attorney General or any of his assistants or anyone else acting or purporting to act for him."

General—did not *unconsciously* influence the Board members so that they felt obliged not to exercise their discretion and, without doing so, to decide against Accardi. Any other finding involves reliance on so remarkable a degree of improbability as to be untenable.

Yet the rejection of the finding does not imply any challenge of the intelligence or integrity of the Board members. One need not turn to the works of Freud and his disciples to learn that unconscious influences importantly affect the memory of honest men; such teachings will be found in the writings of Plato, Aristotle, Euripides, Dante, Montaigne, Shakespeare, Moliere, Pascal, Pope, Byron, Dr. Oliver Wendell Holmes and his sagacious son, to say nothing of novels since Fielding to the present. Indeed, the courts have long recognized that, stimulated by interest, pride or other motives, thoroughly honest and intelligent witnesses may tell unbelievable stories. The books are full of comments like these: "No class of men know better than judges how much interest may unconsciously warp an honest mind."[4a] "Our memories are easy, and ofttimes unconscious, slaves to our wills."[4b] Accordingly, a court may discredit the testimony of a witness "without casting any shade of doubt upon his character."[4c] "The statements of some are unconsciously affected by their wishes, hopes, or prejudices."[4d] Judges have spoken of the "ease with which honest witnesses can persuade themselves that they remember some bygone circumstance which they are ingeniously induced to think that they remember";[4e] of "how extremely prone persons are to believe what they wish."[4f] Because of interest, "very honest persons (such is the infirmity of our nature) often deceive themselves without being aware of it"; they "will often give false color to a transaction, without * * * intending to speak falsely or to suppress the truth."[4g] The judiciary has thus acknowledged the wisdom of the aphorism: "Memory says, 'I did this'; pride says, 'I could not have done it'; eventually pride wins."

The courts, too, have often held that a highly improbable story requires "strong corroboration,"[4h] and that "inherently improbable" testimony, not adequately explained, should be disregarded.[4j] "The circumstances of a case may be such as to make" evidence "utterly incredible, although there are confident attestations in support of it," said Lord Stowell.[4k] A court, remarked Judge Learned Hand, is not obliged to close its eyes "and assume a credulity which no sensible man can * * *."[4l] Evidence, as to human conduct, contrary to common experience, will not be accepted.[4m] The "eye of the law"

**4a.** Grant v. Bradstreet, 87 Me. 583, 609, 33 A. 165, 173.

**4b.** Thomas v. Ribble, 2 Va.Dec. 321, 24 S. E. 241, 245.

**4c.** Fisler v. Porch, 10 N.J.Eq. 243, 245.

**4d.** United States v. Flint, 25 Fed.Cas. pages 1107, 1111, No. 15,121.

**4e.** Hershey v. Blackesley, 2 Cir., 33 F. 922, 924.

**4f.** Crouch v. Hooper, 16 Beav. 182, 185.

**4g.** Marsh v. Tyrrell, 4 Eng.Ecc. 33, 46. See also Vreeland v. Vreeland, 48 N. J.Eq. 56, 21 A. 627, 630; Rogers v. Rogers, 97 Md. 573, 55 A. 450, 456; Thayer v. Hart, 2 Cir., 20 F. 693; Hunter v. Wetsell, 84 N.Y. 549, 556.

**4h.** Moore, Facts (1898) §§ 93, 1146; Smith v. Davis, C.C., 34 F. 783, 784; cf. The William Gray, 29 Fed.Cas. pages 1300, 1302, No. 17,694.

**4j.** Quock Ting v. United States, 140 U. S. 417, 420, 11 S.Ct. 733, 35 L.Ed. 501; Gindorff v. Prince, 2 Cir., 189 F.2d 897; The Dauntless, 9 Cir., 129 F. 715, 721; Fire Association of Philadelphia v. Weathered, 5 Cir., 54 F.2d 779; Emanuel v. Kansas City T. & Tr. Co., 8 Cir., 127 F.2d 175, 180; Moore, loc. cit. § 137.

**4k.** The Argo, 1 C.Rob. 158, 159, quoted in Moore, loc. cit. § 140.

**4l.** Ramopa Company v. A. Gastun & Co., D.C.S.D., 278 F. 557, 559.

**4m.** Gardner v. Gardner, 2 A.C. 723, 730, 736; Earle v. Norfolk, etc. Hosiery Co., 36 N.J.Eq. 188, 194; New York & Brooklyn Ferry Co. v. Moore, 102 N.Y. 667, 6 N.E. 293, 298; Vreeland v. Vreeland, 48 N.J.Eq. 56, 21 A. 627, 631; Whelen v. Osgoodby, 62 N.J.Eq. 571, 50 A. 692, 694; Gardner v. Weston, 18 Iowa 533, 535; Hunter v. New York O. & W. R. Co.,

will not "be blinded" by incredible statements,[4n] statements "beyond the pale of credibility." [4p] "The measure of proof required to establish any proposition must necessarily vary with its degree of probability",[4q] and must be strong in proportion to the degree of improbability.[4r]

Pertinent here is the following: In its opinion, issued on April 3, 1953, the Board said:

"Affidavits of persons well acquainted with the alien, character investigations by the Service and the testimony of four witnesses placed in this proceeding establish that the alien is considered a person of good moral character."

In a "press release" issued that same day, the Attorney General announced

"that the Board of Immigration Appeals has sustained the order of the Immigration and Naturalization Service to deport Joseph Accardi, 43, of Newark, New Jersey. The order charges that he entered the United States at Buffalo, New York, August 19, 1932, without the required immigration visa.

"Accardi, known as a New Jersey racketeer, is a native of Sicily, Italy, and brother of Samuel Accardi against whom denaturalization proceedings are pending in the Federal court at Newark. * * *

"These actions were taken under the current denaturalization and deportation program of Attorney General Brownell against top racketeers and subversives. They are the result of closely coordinated action and

intensive investigation by the Federal Bureau of Investigation and the Immigration and Naturalization Service."

We have in mind, too, the Supreme Court's remarks that this Board is not an independent agency—like the Interstate Commerce Commission or the Securities and Exchange Commission—but a "non-statutory board composed of subordinates within a department headed by the individual who formulated, announced, and circulated such views of the pending proceedings" and that it "would be naive to expect such a heavy handed way of doing things" as an explicit order by the Attorney General to the Board to deny the discretionary relief of suspension of deportation to any alien designated by him.

█ We conclude, therefore, that the Board members, in deciding against Accardi's application for such discretionary relief—i. e., suspension of deportation—were controlled by what amounted to an order from their superior so to decide. The trial judge's finding is "clearly erroneous," since, "although there is evidence to support it," we are "left with the definite and firm conviction that a mistake has been committed." United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; United States v. Oregon State Medical Society, 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978; McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6.

9. To round out the story, it should be noted that the government advances these arguments:

116 N.Y. 615, 23 N.E. 9, 6 L.R.A. 246; Gurley v. Missouri Pac. R. Co., 104 Mo. 211, 16 S.W. 11, 17; Groth v. Thomann, 110 Wis. 488, 86 N.W. 178, 181.

4n. Hook v. Missouri Pacific Ry. Co., 162 Mo. 569, 63 S.W. 360, 362.

4p. Kramme v. The New England, 14 Fed. Cas. pages 852, 853, No. 7,930.

4q. Haworth v. Stark, 2 Cir., 88 F. 512, 514.

4r. Murray v. White, D.C., 9 F. 562, 564; The Gratitude v. Eutaw, D.C., 14 F. 479, 481; The El Dorado, D.C., 27 F. 762, 763; Smith v. Davis, C.C., 34 F. 783, 787; Merritt & Chapman D. & W. Co. v. North German Lloyd, D.C., 120 F. 17, 27; Morison v. Dominion National Bank, 169 Va. 191, 192 S.E. 707, 711; Moore, loc. cit. § 32.

Those more impressed by Latin than English or American, are referred to the maxim, "In obscuris inspici solere quod verisimilius est, aut quod plerumque fieri solet."

(a) The Attorney General, under the regulations, may reverse any Board decision; therefore, says the government, it is absurd to believe that he gave the Board orders directing how they were to decide any particular cases. The government made this same contention in its brief in the Supreme Court.[5] As this argument did not persuade that Court, we do not consider it.

(b) In several instances, says the government, the Board has granted discretionary relief to aliens whom the Attorney General had previously named as within the "program." This argument, also the government made unpersuasively in its brief in the Supreme Court.[6] We may add that there is no evidence that, in those cases, the Attorney General had not withdrawn the names of those aliens from his "program before the Board decided in their favor." Moreover, the Board's chairman significantly testified at the trial that, in every instance where a final decision has been rendered in a case within the "program," the alien was ordered to leave the country voluntarily or to be deported, and that none of such persons was granted suspension of deportation.

10. The Attorney General, on April 23, 1954, a few days after the Supreme Court's decision came down, issued instructions that the Board should not be influenced in its decisions by his "program" but, in each case, should exercise independent judgment.

■ 11. Accardi must be released from custody unless, within a reasonable time, the Board, under those new instructions, holds a new-hearing and renders a new decision on his application for discretionary relief.[7] Although the Board has already found that he has a good moral character, he should have the opportunity at the new hearing to offer evidence that he is not and never has been a racketeer. For it may be that, in so characterizing Accardi, the Attorney General has confused him with someone else of the same name.

Reversed and remanded.

APPENDIX

Press Reports and Press "Releases"

---

5. In its Supreme Court brief, the government said: "It would be a startling thing indeed * * * to suggest that the Attorney General found it necessary to dictate the Board's decision to spare himself the possible task of reversing a determination with which he disagreed. * * * The short answer again is that both functions—the prosecution of deportation cases and decision on applications for discretionary relief—have been entrusted to the Attorney General. The fact that he performed the first is no ground for launching an inquiry into his performance of the second."

6. In its Supreme Court brief, the Government said: In some cases which were "ex-

pedited" under the Attorney General's program, the "Board of Immigration Appeals has affirmed orders granting" discretionary relief. "In other cases, following orders for deportation, the Board has ordered the proceedings reopened to consider further applications" for such relief. "These instances * * * illustrate that decisions in the Department of Justice to commence deportation proceedings are neither decisions in advance on deportability nor judgments in advance on the propriety of discretionary relief."

7. Cf. Mastrapasqua v. Shaughnessy, 2 Cir., 180 F.2d 999, 1003–1004.

84

EXHIBIT
U. S. Dist. Co.
S. D. of N. Y
JUN 23 195
# 11

# U.S. Plans to Deport 100 Alien Racketeers

### By Murrey Marder
#### Post Reporter

Attorney General James P. McGranery announced yesterday that the Justice Department hopes to strip citizenship rights from 100 foreign-born racketeers and deport them.

At the same time he said the department is speeding up similar moves aimed at foreign-born Communists.

"I'm trying to emphasize the great dignity there is in citizenship," said McGranery.

The crackdowns on underworld figures and subversives who are naturalized citizens require proof that fraud was involved in their naturalization. If that is proved, they will then become targets for deportation action, along with certain noncitizens.

The organized drive at foreign-born racketeers is a far larger program than has been previously indicated.

McGranery named seven underworld figures now in custody for the denaturalization-deportation campaign.

One of them, Nicholas D. Circella, whom McGranery described as a former accomplice of Al Capone, was picked up just yesterday in Chicago, he said.

The others include such figures as Frank Costello, New York gambling "czar," and William G. (Big Bill) Lias, who was recently apprehended in Wheeling, W. Va., and also Hyman Stromberg of Philadelphia, Alfred P. Polizzi of Cleveland, Harry Voiler of Miami and Anthony Volpe of Chicago.

The cases to be presented against these men date back to incidents of 10, 20 or 30 years ago.

Asked why action was just now being instituted, McGranery replied he can only be accountable for procedure during his own short tenure in office. Besides, he noted, it takes time to "find some basis for fraud," and also, "some of these men have controlled political machines."

When a reporter asked if he did not believe it likely that the drive could leave him open to "a Republican charge of 'politics,'" McGranery replied:

"Don't you think that everything and anything lays you open to a charge? Isn't it obvious that this very thorough and painstaking plan couldn't be accomplished in two or three weeks?"

McGranery said he has had the antiracketeering drive in mind for two or three years.

"I believe if you want to destroy a thing," he said, "you must pull it out by the roots."

Newsmen questioned McGranery at length about his previously announced plan to hold up the reentry to this country of British-born movie actor Charlie Chaplin, who is now in England.

McGranery vigorously recited "charges" which he said have been made against Chaplin, and said, "I have directed that he be examined and interrogated and qualify as though on an original entry."

"Mr. Chaplin has been here for some 40-odd years," he said. "Mr. Chaplin has enjoyed the

Exhibit # 4

hospitality and all the opportunities of this country," he said although Chaplin is not a citizen.

"They have charged Mr Chaplin, Number 1, . . . with being a member of the Communist Party," said McGranery.

"Who has charged him?" one reporter asked.

"Well, you read the papers," answered McGranery.

"He has also been charged," said McGranery, "with grave moral charges. He has also been charged with making statements which indicate a leering, sneering attitude toward a country whose gracious hospitality has enriched him.

"No harm can come from a fair hearing," said the Attorney General.

McGranery said he has been thinking about the Chaplin case since he read of his "sneering responses" in connection with "his invitation to attend a show for the benefit of some children's thing out there on the West Coast."

The Attorney General said he was concerned about "men so highly publicized" who "show such an utter contemptible regard for the high estate of womanhood."

"If what has been said is true," said McGranery, "he is in my judgment an unsavory character."

McGranery said he cannot publicly discuss his anti-Communist program of denaturalization and deportation in any detail, but noted that "We deported 31 alien Communists this year."

In listing the underworld targets, McGranery indirectly took note of fears expressed by Sen. John J. Williams (R-Del.) that Frank Costello might be deported before he could be used to testify against other racketeers.

McGranery gave assurance that none of those involved would be deported until each has "paid his debt to society." Costello is now serving an 18-month term for contempt of Congress.

Costello, a native of Italy, is a naturalized citizen. Lias, 400-pound retired gambler and now owner of the Wheeling Downs racetrack, claims he is a citizen, but the department lists him as a native of Greece

Circella is the target of deportation action and McGranery said he came here from the British West Indies in 1929 accompanied by Capone Polizzi, who has a police record dating back to 1920, is a native of Sicily and was naturalized in Cleveland in 1928.

Volpe, a native of Argentina, naturalized in Chicago in 1920, is "alleged to have been the personal bodyguard and the executioner for the late Al Capone," said McGranery. Voiler, a Romanian, has a record dating back to 1918, he said.

## Barnard College Editors Vote 5-1 For Stevenson

NEW YORK, Oct. 2 (P.—The editorial board members of the Barnard Bulletin, undergraduate publication of Barnard College, the women's college at Columbia University, came out 5-to-1 today for Gov. Adlai E. Stevenson over Dwight D. Eisenhower.

The paper published two editorials—one representing the viewpoint of the five board members in favor of the Democratic presidential candidate and the other written by the member in favor of the Republican candidate.

Yesterday the Columbia Spectator, undergraduate newspaper, came out editorially for Stevenson. The last time the Bulletin supported a presidential candidate was in 1932 when it came out for Norman Thomas, the Socialist candidate.

Eisenhower is on leave as president of Columbia.

"All the News
That's Fit to Print"

## The New Y

Copyright. 1952. by The New

VOL. CII. No. 34,586.

Entered as Second-Class Matter.
Post Office New York N. Y.

NEW YORK, FRIDAY,

EXHIBIT
U. S. Dist Court
S. D. of N Y.

JUN 23 1954

Exhibit # 6

# ork Times.

York Times Company

OCTOBER 3, 1952.

Ti es quare, New Yor. 26, N. Y
Telephone LACKAWANNA 4-1000

RAG PAPER EDITION
SEVENTY-FIVE CENTS

**LATE CITY EDITION**

Cloudy, then clearing and cooler today. Fair tomorrow.

Temperature Range Today-Max., 62; Min., 50
Temperatures Yesterday—Max., 77; Min., 54
Full U S Weather Bureau Report, Page 41

## M'GRANERY STARTS A DRIVE TO DEPORT ALIEN RACKETEERS

### Campaign Includes Moves to Denaturalize Those Who Have Taken Out Citizenship

### 100 GANGSTERS INVOLVED

### Attorney General Says He Also Will Continue to Rid U. S. of Foreign-Born Reds

**By LEWIS WOOD**
Special to THE NEW YORK TIMES

WASHINGTON, Oct. 2—James P McGranery, Attorney General, announced today a drive to take United States citizenship from naturalized racketeers and criminals, then eject them from this country.

He told a news conference that steps already had been taken against a half dozen undesirable aliens, and that the program would continue against "close to 100 figures in the underworld and organized crime." Mr. McGranery predicted that his plan would "restore the dignity of citizenship" and "do much to destroy the roots of organized crime in America."

He also promised to rid the country of naturalized Communists. And there will be no relaxation in the program of deporting Communist aliens, the Attorney General asserted Thirty-one persons have been deported so far in 1952, he added.

Mr McGranery denied that there were any political implications in announcing his campaign at a time when Republicans were assailing the Administration for alleged laxity in proceeding against subversive persons. He said that the study under which he would proceed had been going on for weeks, and that he had considered it long before taking his Cabinet office last May.

#### McGranery Attacks Chaplin

Mr. McGranery spoke critically of Charlie Chaplin, the British-born film actor, whom Immigration authorities will question closely before he will be readmitted to this country. If assertions about Mr. Chaplin are true, "he is in my judgment an unsavory character," the Attorney General said, adding:

## McGranery Opens Drive to Deport 100 Alien Figures in Underworld

Continued From Page 1

full his obligation to this country" before deportation proceedings would begin.

As an example of the persons he seeks to deport, Mr. McGranery cited Nicholas D. Circella, who was arrested in Chicago today on a deportation warrant.

The Attorney General said that Circella, who had a long criminal record, last entered this country in 1929 accompanied by Al Capone the gangster, and that at the time Circella wrongly claimed United States citizenship.

#### Other Proceedings Started

Denaturalization proceedings also have been started against the following three men, Mr. McGranery said:

Hyman Chaim Stromberg, arrested at Miami A native Russian, who was naturalized in New York in 1945, Stromberg was reported to have "controlled the numbers, bookmaking and other gambling activities in Philadelphia for more than ten years."

Alfred P. Polizzi arrested at Miami, A native Sicilian, who was naturalized in Cleveland in 1928, Polizzi was said to have been a prohibition era bootlegger and later a gambling operator at Cleveland and Newport, Ky. His police record dates back to 1920.

Anthony Volpe, taken into custody at Miami. It is alleged that he was a bodyguard and "executioner" for Al Capone In recent years he was said to have been conducting extensive bookmaking operations in Chicago.

Deportation proceedings were announced against the following:

Harry Ozias Voiler, a native of Rumania, arrested at Miami. His police record goes back to 1918. He served a robbery sentence in the Michigan State Penitentiary, officials said.

William Lias, Wheeling (W. Va.) race-track man and gambling figure, who has been fighting the Government over alleged income-tax evasion.

Mr. McGranery made plain that in attempting to denaturalize the accused persons, some basis for fraud in making their citizenship applications must be discovered, He implied that the Justice Department and Immigration officials had been carefully combing the records to avoid mistakes.

Discussing the Chaplin case, the Attorney General said that the actor had been in the United States forty-one years, "enjoying the hospitality and all the opportunities of this country," without becoming a citizen. He added that he had reasons for directing that the actor "be questioned on his original entry" when he returned to the United States.

#### Breaking Faith Is Denied

"His lawyer said we broke faith concerning his re-entry permit, but such a permit is merely identification." Mr. McGranery asserted. He stressed that a re-entry permit did not necessarily assure automatic new admission to this country.

"No harm can come from a fair hearing for Chaplin," he said. "If he can meet the standards, he will be admitted."

Long before entering the Cabinet, Mr. McGranery added, he had heard criticisms of Mr. Chaplin. One instance he cited concerned an invitation "for a children's affair on the West Coast."

Mr. Chaplin, the Attorney General declared, was said to have spoken "with contemptible regard for the high estate of womanhood," and "if what has been said is true," he is an unsavory character."

#### Bomb Found in Tokyo Embassy

TOKYO, Oct. 2 (UP)—A small, home-made fire or stench bomb was found inside the United States Embassy compound this morning. But an embassy official said it was "certainly not" explosive or lethal.

"He has been publicly charged with being a member of the Communist party, and with grave moral charges, and with making statements that would indicate a leering, sneering attitude toward a country whose hospitality has enriched him."

The Attorney General again said that he would start denaturalization proceedings against Frank Costello, the gambler, who is now serving an eighteen-month prison sentence for contempt of Congress. The Justice Department has accused Costello of concealing his criminal record when he obtained United States citizenship in 1925. Mr. McGranery said that the gambler would have to "discharge in

Continued on Page 9, Column 2

88

## McGranery Disavows Political Motives in Moves to Deport 100 Naturalized Citizens, Aliens

The Justice Department's drive to rid the country of some 100 naturalized citizens and aliens with underworld or other unsavory reputations is no sudden face-saving device for the Democratic administration, according to Attorney General McGranery.

He announced late yesterday that six such foreign-born persons, several of whom apparently never became citizens, already have been picked up. Denaturalization or deportation proceedings will be started at once.

These do not include Communists, naturalized or alien. But the overall drive, Mr. McGranery explained, will apply to Communists who might legally be subject for certain offenses or fraudulent statements.

Note, at this stage, the action does not include Charles Chaplin, the actor who is to be questioned by immigration authorities when he returns from a trip to his native England, the Attorney General added.

**Exception to Protest.**

"But if what has been said about Mr. Chaplin is true," he declared, "he is, in my judgment, an unsavory character. It has been publicly charged that he was a member of the Communist Party, and with grave moral charges and with making statements that would indicate a leering, sneering attitude toward a country whose hospitality has enriched him. No harm can come from a fair hearing."

Mr. McGranery took exception to Mr. Chaplin's recent protest that the Government broke faith with him. Mr. Chaplin said he was granted a re-entry permit and, when he learned in mid-ocean that, on his return, he would be required to show, as does every alien seeking original entry, that he is admissible under this country's immigration laws.

The Attorney General said a re-entry permit is primarily an identification document and not an arrogant that a person can, or will be admitted to the United States.

Reporters asked Mr. McGranery whether there was any connection between the current election campaign and the Justice Department's "sudden" moves against "racketeers as Communists, Charles Chaplin or underworld naturalized citizens or unsavory aliens

**Political Aims Denied**

The Attorney General declared there was no political purpose. It was obvious, he said, that the was a similar course.

He remarked also that, long before he became Attorney General, he advocated such moves.

"Our final goal," he said, "is to restore the dignity of citizenship and to realize the promise of a full life in accordance with American ideals for those who come to us from foreign lands.

"In order to achieve this the end, it is necessary to thwart the criminal activities as pursued by unlawful recipients of America's hospitality—the naturalized citizens—who insult the flag and the Nation by disrespect and disobedience to the laws of the land.

"Here there will be a series of individual petitions to the Federal courts to revoke naturalization. We will pursue a similar course with respect to Communists who have reached their status as citizens through naturalization. In addition, appropriate action for deportation will be taken against the unsavory characters who have continued to be aliens technically as well as in the broader sense."

**Six Picked Up in Week.**

The Justice Department previously announced it will move for denaturalization of Frank Costello, New York racketeer now serving an 18-month prison sentence for contempt in refusing to answer questions of the Senate Crime Investigating Committee.

Mr. McGranery yesterday said the following six other persons had been picked up within the past week:

Nicholas D. Circella of Chicago, according to the Attorney General, came to this country in 1929 and has since built up a long criminal record.

Alfred Polizzi of Miami, described as a gambler and former bootlegger, who came here from Italy and was naturalized in 1928.

Anthony Volpe of Chicago, reputedly a bodyguard and one-time personal bodyguard of Al Capone, Mr. McGranery said. Volpe was naturalized in 1920.

Harry O. Voder of Miami, who Mr. McGranery said is not a citizen but has a criminal record dating back to 1918 in this country, described as a millionaire mob track czar and former bookie czar, who despite Justice Department contention that he was not born in the United States.

Hyman C. Stromberg of Philadelphia, a Russian native, naturalized in 1945 and described as a William G. Liss of West Virginia.

**Cola Cossa Murder**

After a series of rows with his laundry over his ice cold, a racketeer over his ice cold... Holland, strangled the laundry, hanged the cat and saved himself.

**Hechinger's**
better values in
**Lumber**

**Choose From Two Prices**

For some uses, the lower grade may be satisfactory. Visit our yards, inspect the bargain stock before buying, but we'll guarantee the better grade and deliver on . . .

Phone Orders Lincoln 7-9400

Two Different Sizes of **Studding**

SPECIAL THIS WEEK   8-Foot **56c**

THE COFFEE WITH THE *Aromatic Flavor*

NOB HILL COFFEE

the coffee that "tastes as good as it smells" . . . at SAFEWAY

SPECIAL for Saturday Only!

at all Hot Shoppes and Hot Shoppe Pantry Houses

PUMPKIN PIE
ONLY **49c**
REGULARLY 59c

Made From Thumping--Ripe Pumpkins, Spiced to Rich Perfection!

**HOT SHOPPES**
Restaurants & Pantry Houses

EXHIBIT
JUN 23 1954
U.S. Dist. Court
S.D. of N.Y.

Exhibit # 5

"For Immediate Release
Friday, April 3, 1953

"Department of Justice

"Attorney General Herbert Brownell, Jr., announced today that the Board of Immigration Appeals has sustained the order of the Immigration and Naturalization Service to deport Joseph Accardi, 43, of Newark, New Jersey. The order charges that he entered the United States at Buffalo, New York, August 19, 1932, without the required immigration visa.

"Accardi, known as a New Jersey racketeer, is a native of Sicily, Italy, and brother of Samuel Accardi against whom denaturalization proceedings are pending in the Federal Court at Newark."

"For Release to Morning Papers of Wednesday, May 20, 1953

"Address
"By

"Honorable Herbert Brownell, Jr., "Attorney General of the United States.

" * * * But here are a few examples of the thousands of decisions and actions the Department of Justice may be called to make and take in a single day: * * * to initiate deportation proceedings against undesirables like Joseph Accardi. * * * "

"Organized Crime

"Its Threat To Business And Government

"Address
"By

"Warren Olney III
"Assistant Attorney General
of the United States

\* \* \* \* \* \*

"Friday, October 30, 1953.

\* \* \* \* \* \*

"The second area is one in which the Department of Justice has not only primary but exclusive jurisdiction—the field of denaturalizing and deporting gangsters and racketeers, who are foreign-born and who, because of their criminal activities, can make no claim to remain in the United States while violating its laws. * * *

"To name but a few of the nationally known hoodlums who are the objects of the program—Spinella from Florida and De Simone from Missouri have been deported—Nicolo Impostato of Kansas City, Jack Dragna of Los Angeles, Joe Accardi of New York and Joe Adonis of New York have all been ordered deported. \* \* \* "

"For Immediate Release
"Friday, May 8, 1953

"Department of Justice

"Attorney General Herbert Brownell, Jr. announced today that a petition seeking cancellation of the naturalization of Gaetano Martino, Brooklyn, New York, has been filed in the U. S. District Court of Brooklyn.

"The move was another step in the *program for denaturalization and/or deportation of racketeers and others who have engaged in criminal activities.*"

CLARK, Chief Judge (concurring in the result).

I concur in the result reached in the majority opinion, but do not feel it necessary to explore, as it does, the underlying motivation of the Board members. What the Supreme Court required the relator to prove he has now adequately demonstrated; namely, that there was a list as alleged, that he was on it, and that this fact was known to the Board. I do not believe that the Supreme Court required us to go beyond this to speculate about the effect of this knowledge on the exercise of the Board's discretion. That would surely be a vain task; all judges naturally and honestly believe that they are above bias. But the facts shown create a presumption of bias not overcome by the Board's self-serving declaration to the contrary. This would be so, whether the program was one of expedition or one of deportation, for in either case relator was being singled out as an alien whose imminent departure was deemed desirable by the Attorney General.

What, then, should be the proper disposition of this case? The Supreme Court advised thus: "If petitioner can prove the allegation he should receive a new hearing before the Board without the burden of previous proscription by the

list. After the recall or cancellation of the list the Board must rule out any consideration thereof and in arriving at its decision exercise its own independent discretion, after a fair hearing, which is nothing more than what the regulations accord petitioner as a right." 347 U.S. 260, 268, 74 S.Ct. 499, 504, 98 L.Ed. 681. I am not convinced that the Attorney General's instructions of April 23, 1954, constituted a withdrawal of the list. Since we cannot effectively control the Attorney General in the administration of his office, we can require only that at a new hearing relator should at least have the opportunity to present evidence rebutting the Attorney General's characterization of him as a racketeer.

HARLAN, Circuit Judge (dissenting).

I am unable to agree with the result reached by my brethren in this case. I read the majority opinion in the Supreme Court as holding that the issue on which the relator was entitled to a hearing before the Court was whether the Board's denial of discretionary relief represented its own untrammelled decision or one dictated by the Attorney General. Mr. Justice CLARK said: "It is important to emphasize that we are not here reviewing and reversing the *manner* in which discretion was exercised. * * * Rather, we object to the Board's alleged *failure to exercise* its own discretion * * *." (Italics in original.) The language in the preceding paragraph of Justice CLARK'S opinion means no more, I think, than that the relator's allegations sufficiently charged "dictation" by the Attorney General, and not that the acts alleged, if proved, necessarily resulted in dictation.

The relator has had his hearing on this issue and the trial Judge has found that the Board members "reached their individual and collective decision on the merits, free from any dictation or suggestion by the Attorney General or any of his assistants or anyone else acting or purporting to act for him." That finding is supported by the sworn and unequivocal testimony of the Board members who sat on Accardi's case—the Chairman testifying in person and the others by deposition—and I cannot regard the finding as "clearly erroneous." Nor can I agree with Judge CLARK who holds, as I understand his concurring opinion, that we may accept the finding but side-step its effect. Such a result can be achieved only by giving the Supreme Court's opinion an interpretation which I do not think it will bear.

In my view, the dismissal of the writ should be sustained.