# 𝕾taunton

R. A. MORISON, ET AL. V. DOMINION NATIONAL BANK.

September 23, 1937.

Present, All the Justices.

The opinion states the case.

*William A. Stuart, Donald T. Stant* and *H. E. Widener,* for the appellants.

*Leonard R. Hall, Henry Roberts* and *Stuart Carter,* for the appellee.

HOLT, J., delivered the opinion of the court.

Plaintiff's original bill was filed in the Circuit Court of Washington County on January 7, 1931. Afterwards, and on October 22, 1934, this cause was removed to the Corporation Court of the city of Bristol.

Complainant, appellant here, R. A. Morison, was indebted to the defendant, a bank in Bristol, and contends that he deposited with that bank to secure his notes which it held certain collateral. That collateral, he charges, has been misused and not accounted for. All charges were denied and the relief sought was refused.

R. A. Morison and A. K. Morison are brothers. R. A. Morison is a physician and A. K. Morison is a business man of wide experience and was at one time an officer of the

defendant bank. Particularly he was interested in the mining development of feldspar properties. The Erwin Feldspar Company was a corporation so engaged, as was the Crabtree Feldspar Company. This latter company was unsuccessful and its physical properties were taken over by the former whose name was changed to Erwin Feldspar Company, Incorporated. The properties thus taken over were paid for by preferred stock of the last named company issued in blank to the Crabtree Feldspar Company. This Erwin Feldspar Company, Incorporated, was afterwards absorbed by the Consolidated Feldspar Corporation of New Jersey and that was the situation which obtained when this litigation was instituted.

In 1924, R. A. Morison purchased a home in Abingdon and to meet his cash payment it was necessary for him to borrow money. To that end, A. K. Morison, on April 12, 1924, gave to the bank his note for $1,500, secured by twenty shares of Abingdon Water Company stock. That note was a collateral note and contained the provisions which usually appear in such obligations. On the day of its execution its proceeds, through a draft, were transferred to the account of R. A. Morison. Its renewal appears with R. A. Morison as maker and A. K. Morison as endorser, and carried the same collateral.

On December 8, 1922, R. A. Morison executed to the bank another note for $800 with A. K. Morison as endorser thereon. This note was an ordinary note and was not primarily designed for collateral, although it was secured by the same collateral deposited to secure the $1,500 note. These notes were renewed from time to time and were on August 13, 1927, merged into one collateral note for $2,300 made by R. A. Morison and endorsed by A. K. Morison. This note was last renewed on October 1, 1930, when by reason of curtailments it was in amount $1,675. All of these renewals bore upon their face this statement: "Certiff. #61—25 shares of Erwin Feldspar Co."

Said twenty shares of Abingdon Water Company stock were loaned by A. K. Morison to R. A. Morison, who used

them as collateral in the manner indicated. The Abingdon Water Company sold its plant and went out of business, and for this block of twenty shares of stock there were substituted twenty shares of common stock issued by the Erwin Feldspar Company. Afterwards, when the Crabtree Feldspar Company was taken over by the Erwin Feldspar Company, Incorporated, this common stock appears to have been called in to be replaced by preferred stock, and it is the contention of the complainant that it was replaced by twenty-five shares of this preferred stock, issued in blank for value to the Crabtree Feldspar Company, transferred to A. K. Morison and sold by him to R. A. Morison.

A. K. Morison came to own this preferred stock in this wise: The Crabtree Feldspar Company was on the verge of failure. In its extremity he and others interested came to its relief and loaned each to that company $6,000, which was to be secured by a mortgage on its physical properties. That mortgage was prepared but before recordation the Crabtree properties were taken over by the Erwin Feldspar Company, Incorporated, which paid for its purchase in preferred stock. After negotiations, A. K. Morison agreed to waive his claim for bonds representing his $6,000 loan and took in lieu thereof seventy-five shares of this preferred stock.

At that time R. T. Irvine, A. K. Morison and A. K. Morison, executor of H. G. Morison, deceased, were indebted to the Dickenson County Bank in the sum of $478.24, represented by their note to it. Of these makers, A. K. Morison alone was solvent. At the same time A. K. Morison as executor of H. G. Morison, deceased, was indebted to said bank in the sum of $1,890. This indebtedness was evidenced by a note endorsed by A. K. Morison. A. K. Morison thereupon agreed to sell to R. A. Morison twenty-five shares of preferred stock of Erwin Feldspar Company, Incorporated, the consideration being that R. A. Morison should become primarily liable for these two obligations, and thereupon they were consolidated and a single note was executed as of May 3, 1927, for $2,368.24, made by R.

A. Morison and endorsed by A. K. Morison. Some curtails were later made but upon default it went to judgment and that judgment, subject to a compromise deduction of some three or four hundred dollars, has been paid by R. A. Morison. It was in this manner that R. A. Morison took title to stock which had theretofore been loaned to him by A. K. Morison for use as collateral. Certainly that is his contention.

The bill in this cause was filed on January 7, 1931. It contains this statement:

"Said A. K. Morison was accommodation endorser of said note ($1,500.00). The collateral security recited in said note consisted, as above shown, of certificate No. 61 of the Erwin Feldspar Company, Incorporated, for 25 shares of the stock of said corporation. While not specifically so shown upon the note, said stock was in fact preferred stock of said corporation. Said certificate was issued in the name of Crabtree Feldspar Corporation, and at the time said certificate was pledged as collateral security for said note, it was the property of said A. K. Morison, the endorser on said note. Said A. K. Morison is the brother of your complainant and lent him said certificate for use as collateral upon said note."

In an answer filed on April 4, 1931, plaintiff's statements as to the ownership of this stock and as to the manner in which it came to be used by R. A. Morison as collateral are admitted. Evidence was taken beginning on October 19, 1934. After R. A. Morison had been examined in chief, the defendant filed an amended answer on October 29, 1934. It then denied that A. K. Morison was the owner of this stock or that he had loaned it to his brother for use as collateral. After evidence had been concluded, complainant filed an amended bill, in which it is conceded that he might have been mistaken as to the ownership of certificate No. 61, for said twenty-five shares of stock. A. K. Morison in his evidence said:

"Q. 14 Then do I understand that the certificate No. 61, which is listed as collateral on these notes of Dr. R. A.

Morison, and which is for 25 shares of the preferred stock of the Erwin Feldspar Company was the 25 share certificate which you acquired in the manner you have described?

"A. I cannot attempt to say that I remember the number of the certificate I loaned Dr. Morison, but I know I loaned him 25 shares of stock which went up as collateral on his debt, and in view of the fact that all of the notes renewals carried the number of that certificate as Certificate No. 61, I assume it is the same Certificate.

"Q. 16 At any rate, you know the 25 shares you thus acquired were the same 25 shares you loaned to Dr. Morison on his note?

"A. Yes, I know I received a certificate for 25 shares and I know I loaned it to Dr. Morison for collateral on his debt; whether this certificate has been substituted for some other certificate in the bank I don't know."

Complainant contends that the number of this certificate was the number given to him by the bank, and it is the number written into the notes themselves. After all, the number of the certificate is not necessarily a matter of primary importance, but what is of importance is this: Was collateral deposited to secure this indebtedness, and if so, by whom and who owned it? Should it appear that there was such a deposit, then the burden is upon the bank to account for the manner in which it has been used.

As we understand it, the contention is that this notation of collateral made by the bank was made to make a note of doubtful solvency appear to the bank examiner to be solvent and well secured. Surely this is an explanation that no bank should ever be called upon to make. In dealings with examiners the utmost good faith is to be expected as a matter of course. Anything short of this is a fraud upon him and a fraud upon the public.

We have seen that the Bristol bank first held as collateral stock of the Abingdon Water Company, for which, by consent, there was afterwards substituted twenty shares of the common stock of the Erwin Feldspar Company. When that company took over the assets of the Crabtree Feldspar Com-

pany, it became necessary to exchange this common stock for preferred stock of the Erwin Feldspar Company, Incorporated, and on January 4, 1926, the defendant bank sent to the Unaka City National Bank of Johnson City, Tennessee, two hundred and twenty shares of that stock in which was the twenty shares of substituted collateral.

Thereafter this letter was written:

"Bristol, Va.-Tenn.
"March 17, 1926.

"Mr. A. K. MORISON,
"Bristol, Virginia.

"Dear Mr. Morison:

"Confirming my conversation with you this morning, with reference to the 220 shares of stock of the Crabtree Feldspar Corporation, which we deposited with Mr. Shumate, of the Unaka-City National Bank, Johnson City, Tenn., as Trustee, authorizing him to exchange the said 220 shares of the Common stock of the Company for like amount of the Preferred stock:

"Mr. T. H. Morris has returned us 85 shares of the above stock to be placed upon his note of $8,500.00.

"We are entitled to 50 shares of the Preferred stock to be placed upon the loans of H. G. Morison, *and 20 shares upon the note of R. A. Morison.*

"If you will arrange to send us the 50 shares of the Preferred stock due us on the H. G. Morison notes and 20 shares due us on the R. A. Morison note, and an additional 15 shares to be placed on the T. H. Morris note of $8,500.00 I believe our Committee will be willing to accept this.

"In other words, this means that we are giving you 50 shares of the Preferred stock that we are entitled to, under the agreement with Mr. Shumate, Trustee, to deliver the 220 shares of the Common stock for like amount of the preferred stock and return to us.

"I will thank you to have this matter adjusted at an early date, as I am anxious to get our records clear with reference to this transaction.

"Very truly yours,

"C. S. Carter,

"President."

Just why the bank wanted A. K. Morison to arrange for the return of this twenty shares of stock, we do not know. In the ordinary course of business it would have been. returned direct by the Tennessee bank to the Bristol bank.

On November 15, 1930, complainant's counsel wrote to the bank for information as to what had been done with this stock, deposited as aforesaid, and received in reply this letter:

"Bristol, Va.-Tenn.

"November 15, 1930.

"White, Penn and Stuart, *Attorneys,*

"Abingdon, Virginia.

"Gentlemen:

"With further reference to your letter of November 3rd:

"Several years ago we handled for Mr. A. K. Morison, Judge H. G. Morison and Mr. T. H. Morris, certain personal notes of theirs, and their companies. Among these notes was a note of Dr. R. A. Morison endorsed by Mr. A. K. Morison.

"After these notes had been running for some time we asked these gentlemen to provide collateral for some. of these loans. We were then instructed by Mr. A. K. Morison and T. H. Morris to place as collateral on these loans, stock of the Erwin Feldspar Company, and by agreement, placed on Dr. R. A. Morison's note twenty-five shares of the Erwin Feldspar Company stock, to reinforce the endorsement of Mr. A. K. Morison. This stock belonged to Mr. A. K. Morison, and never belonged to Dr. R. A. Morison.

"It was understood that after Dr. Morison's note was paid, that this stock would then go back to us as collateral on notes of Mr. A. K. Morison and Judge H. G. Morison.

"I feel sure that when this is explained to Dr. Morison that he will agree that he has no interest in the stock in question, and that it was placed on his note for the purpose outlined above, and that the loan was made to him strictly as an accommodation.

"Very truly yours,

"A. E. ANDERSON,
"Vice-Pres. Cashier."

Here we have a statement to the effect that this was A. K. Morison's stock and that it was placed as collateral on said note but the undisputed evidence is that A. K. Morison had sold it to R. A. Morison. The manner in which it was held by the bank is further shown by endorsements made upon the Morison notes themselves, made time and again, sometimes by the bank and sometimes by R. A. Morison, and accepted by it.

██ There can be no doubt but that the bank was first secured by Abingdon Water Company stock and that it was afterwards secured by common stock of Erwin Feldspar Company substituted by consent. With this debt well secured it would be most extraordinary if the bank released solvent collateral and took nothing in its place. We may fairly say that such conduct would have been against human experience. Certainly in any event it placed upon the bank the burden of evidence and the burden of presumption. The bank is required to go forward with its proof and to explain satisfactorily its reasons for giving up good security and taking nothing in its place. A slight preponderance of evidence will support a course of action entirely reasonable. When such action is utterly unreasonable it must be strongly supported.

There is in the record a letter from the Crabtree Feldspar Company to the bank saying that they were forwarding stock certificate No. 61 for twenty-five shares of preferred stock to the bank to be placed as collateral on its, the Crabtree Company's note.

We may assume that this company made no mistake in the description of this collateral thus forwarded, but that does not help us much, for our inquiry is not, was certificate No. 61 the number of the certificate deposited by Morison as collateral, but did he deposit as collateral preferred stock to the amount claimed. Two other certificates appear in the record and are for twenty-five shares each, certificate No. 60 and certificate No. 63.

The amended answer of October 29, 1934, makes in substance these statements. It said that the bank held two hundred and twenty shares of common stock of the Crabtree Feldspar Corporation which had been substituted for the Abingdon Water Company stock, and that this stock was sent to the Unaka City National Bank to be exchanged for two hundred and twenty shares of Erwin Feldspar Company preferred stock. It may be noted at this point that Mr. Shumate, president of the Unaka Bank, said that the stock sent to him was common stock of the Erwin Feldspar Corporation to be exchanged for preferred stock, and this we think is according to the facts. The Bristol bank's answer goes on to say that this exchange was not completely perfected and through the agency of its correspondent only one hundred and eighty-five shares were exchanged, and that thirty-five shares were never exchanged; in this thirty-five shares of unexchanged stock it includes the stock which it held for A. K. Morison. The Unaka Bank was the agent for the Bristol bank, and if A. K. Morison's stock was lost, it should have called that agent to account. Such action was not only a duty due to a client but would have been one prompted by ordinary instincts of self-protection. Its failure to act is susceptible to only one reasonable explanation —collateral was substituted for that theretofore given, and no one could have been expected to make substitution except the Morisons. The bank's contention now is that all of this two hundred and twenty shares of stock returned was placed as collateral upon debts of the Crabtree Corporation. It was doubtless correctly so placed, if we except said twenty-five shares. The net effect of what the bank has

done is this: It has taken from a note, probably solvent in itself, collateral, and placed it to the credit of another note which it could never hope to collect. If this is permitted, all that the bank realizes is pure gain.

The evidence of the bank's officials, in the main, sustain its claim, but that claim is shaken by these facts: It is not reasonable; it is contradicted by the bank's own records and by the bank's own letter, and by the testimony of R. A. and A. K. Morison, who both definitely placed this stock with the bank as collateral on the R. A. Morison note.

The Morisons seem to be men of standing; they are either telling the truth, or they have both conspired and perjured themselves deliberately, and this for the sake of a claim worth from $1,500 to $2,000. On the other hand, the bank has by its own evidence shown its records to be unreliable. It stated that A. K. Morison did own this stock and it has stated that he did not, and so, without charging any purpose to deceive, we think that its officers are probably mistaken. It is further contended that A. K. Morison knew all that had been done; talked the matter over with bank officials, opposed dealings with the New Jersey corporation, but stated that he had no interest at stake and that it was a matter for the bank to settle for itself. If Morison had no interest in this stock there was no occasion for any conference between him and the bank. Moreover he has denied that he ever so expressed himself. Let us assume that he did. Both his testimony and R. A. Morison's testimony tell us that he was not the agent for his brother and therefore could not bind him had he so desired.

These things are not in dispute. A. K. Morison did own stock in the Abingdon Water Company and loaned it to R. A. Morison. For this stock was substituted common stock in the Feldspar Company. A. K. Morison tells us how he came to own this preferred stock. It was given to him in lieu of bonds promised and for money loaned. He must have received this stock because his brother would not have bought from him non-existent stock and paid therefor by assumption of indebtedness amounting to over

$2,000 which, as we have seen, has been reduced to judgment, which judgment R. A. Morison has paid.

■ To restate our conclusions, we think this stock was placed by complainant with defendant as collateral. This conclusion, we believe, is supported by satisfactory evidence, in the light of which the bank was charged with the duty of going forward with its evidence and with explaining satisfactorily why it or its proceeds should not be credited upon complainant's note. This it has not done.

Much has been said in argument about the weight which we should attach to the judgment of the chancellor below, now before us on appeal. Evidence is in the form of depositions and exhibits. The chancellor never saw the witnesses, and there is no commissioner's report.

■ Where the entire case is submitted to the court and where the judge presiding sees the witnesses and hears them testify, his judgment is entitled to that credit which generally attaches to a jury's verdict. *Bunkley* v. *Commonwealth,* 130 Va. 55, 108 S. E. 1.

■ In *Catron* v. *Norton Hardware Co.,* 123 Va. 380, 96 S. E. 853, 855, Judge Burks said:

"Had the witnesses appeared before the trial judge and testified in his presence, I should unhesitatingly have been of opinion to affirm his decree; but all the evidence in these causes was given in the form of depositions, and the trial court was in no better position to judge of the weight of the evidence than this court is. His personal opinion of the character of witnesses who testify in a cause cannot take the place of evidence properly introduced, subject to cross-examination. Of course, no intimation is intended that such a course was adopted in the instant case. Undoubtedly the decree of the trial court is entitled to great respect, and is generally presumed to be right, but where the evidence was not given before the trial court, but by depositions, and is conflicting, and involves not only the question of the credibility of the witnesses but the charge of fraud on the part of some of the parties who have testified in the cause, it is peculiarly a case for an issue to be tried by a jury, and if

the chancellor has failed to order it, though not requested by the parties, his decree will be reversed."

In *Swetnam* v. *Antonsanti,* 150 Va. 534, 143 S. E. 716, 719, Campbell, J., cited with approval this statement of the law made by Judge Prentis in *White* v. *Reed,* 146 Va. 246, 254, 135 S. E. 809:

"The burden which is cast upon the appellant in this court is not merely to lodge a doubt, but to satisfy this court of the error assigned. It would be going too far, perhaps, to say that error must be demonstrated, for that might be construed to imply mathematical precision, but certain it is that an opinion reversing a judgment should convince the impartial mind."

This statement we again approve.

For reasons given, the decree appealed from must be reversed. Complainant is entitled to have the proceeds of this collateral applied upon his indebtedness as of the date of its conversion, if it has been converted, or rather to have its value as of the date of said conversion so applied together with any dividends which the bank may have collected on it.

*Reversed and remanded.*

HUDGINS and BROWNING, JJ., dissenting.