219 F.2d 77
 UNITED STATES of America ex rel. Joseph ACCARDI, Relator-Appellant,
v.
Edward J. SHAUGHNESSY, District Director of the Immigration
and Naturalization Service, New York District,
Department of Justice, Respondent-Appellee.
 No. 97, Docket 23191.
 United States Court of Appeals, Second Circuit.
 Argued Nov. 8, 1954.
Decided Jan. 7, 1955.
Writ of Certiorari Granted March 14, 1955.
See 75 S.Ct. 525.
 
 Jack Wasserman, Washington, D.C., (Irving Rader, of counsel, New York, N.Y.), for relator-appellant.
 J. Edward Lumbard, New York City (Harold J. Raby and Lester Friedman, New York City, of counsel), for respondent-appellee.
 Before CLARK, Chief Judge, and FRANK and HARLAN, Circuit Judges.
 FRANK, Circuit Judge.
 
 
 1
 1. We shall assume familiarity with the facts stated in our previous opinion, 2 Cir., 206 F.2d 897, and in the opinion of the Supreme Court, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681. We do stress one fact: The particular kind of discretionary relief sought by Accardi was suspension of deportation, pursuant to Section 19(c) of the Immigration Act of 1917, as amended in 1948,* which, so far as pertinent, provides:
 
 
 2
 'In the case of any alien (other than one to whom subsection (d) is applicable) who is deportable under any law of the United States and who has proved good moral character for the proceding five years, the Attorney General may * * * suspend deportation of such alien if he is not ineligible for naturalization or if ineligible, such ineligibility is solely by reason of his race, if he finds (a) that such deportation would result in serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien; or (b) that such alien has resided continuously in the United States for seven years or more and is residing in the United States upon July 1, 1948.' 8 U.S.C. (1946 ed. Supp. V) Sec. 155(c).
 
 
 3
 2. Printed in the Appendix to this opinion are certain 'public announcements' of the Attorney General, consisting of newspaper reports of interviews with him and of 'press releases' issued by him. They were not called to our attention on the previous appeal. But they were submitted by the government to the Supreme Court. Apparently the Supreme Court took judicial notice of them, since it referred to and relied upon them in its opinion. These data were received in evidence at the subsequent trial and are now in the record before us. They are significant because of the following portions of the Supreme Court's opinion (347 U.S. 260, 74 S.Ct. 503):
 
 
 4
 'We think the petition for habeas corpus charges the Attorney General with precisely what the regulations forbid him to do: dictating the Board's decision. The petition alleges that the Attorney General included the name of petitioner in a confidential list of 'unsavory characters' whom he wanted deported; public announcements clearly reveal that the Attorney General did not regard the listing as a mere preliminary to investigation and deportation; to the contrary, those listed were persons whom the Attorney General 'planned to deport.' And, it is alleged, this intention was made quite clear to the Board when the list was circulated among its members. In fact, the Assistant District Attorney characterized it as the 'Attorney General's proscribed list of alien deportees.' To be sure, the petition does not allege that the 'Attorney General ordered the Board to deny discretionary relief to the listed aliens.' It would be naive to expect such a heavy handed way of doing things. * * * If petitioner can prove the allegation, he should receive a new hearing before the Board without the burden of previous proscription by the list. After the recall or cancellation of the list the Board must rule out any consideration thereof and in arriving at its decision exercise its own independent discretion, after a fair hearing, which is nothing more than what the regulations accord petitioner as a right.'
 
 
 5
 3. The government contends that, reasonably construed, those published utterances of the Attorney General could mean no more than that the hearings of persons included in his 'program' should be 'expedited.' The government, explicitly and repeatedly, advanced that same contention in its brief in the Supreme Court.[1] It seems obvious that the Supreme Court rejected it.
 
 
 6
 4. If more were needed as to the meaning of the Attorney General's statements and 'releases,' we now have the testimony of the then Attorney General, McGranery, which amply supports the Supreme Court's interpretation.[2] We must take it, then, that the Attorney General's clearly stated intention was to deport anyone named by the Attorney General as within his program.
 
 
 7
 5. We read the Supreme Court's opinion as holding this:
 
 
 8
 (a) The Attorney General's statements, reported in the press and in his press releases, 'clearly reveal that the Attorney General did not regard the listing as a mere preliminary to investigation and deportation,' but, 'to the contrary,' showed that 'those listed were persons whom the Attorney General 'planned to deport."
 
 
 9
 (b) Accardi is entitled to a new hearing before the Board-- of the kind described by the Supreme Court-- if at a trial in the district court he can prove that
 
 
 10
 (1) he was one of the persons to whom the Attorney General thus referred, and
 
 
 11
 (2) a majority of the Board knew that fact, and
 
 
 12
 (3) the majority was affected by it when the Board denied him discretionary relief.
 
 
 13
 6. The evidence leaves no doubt that Accardi was so named.
 
 
 14
 7. Was the Board informed of this fact? The trial judge so found, stating: 'In accordance with the practice in such cases, notice was given to the Board that Accardi was an alien embraced within the Attorney General's program.' He made this finding, despite the oral testimony of the Board's Chairman that, previous to the Board's decision, he had no such knowledge. As this finding has support in the deposition-testimony of one Board member, and as two other members, also testifying by deposition, said they could not remember whether or not they then had had such knowledge, we see no reason why we should not accept that finding.[3]
 
 
 15
 8. This leaves but one issue of fact: Was a majority of the Board members influenced by that knowledge? All the Board members testified they were not, because, they said, a notification from the Attorney General that any particular alien was within his 'program' meant, to them, merely that the Attorney General desired an expeditious consideration and determination of that alien's case. The trial judge, on the basis of that testimony, found that such as the Board's understanding;[4] and he grounded his decision primarily on that finding, saying that he could see 'no rational ground for disbelieving the witnesses' on that score.
 
 
 16
 This finding, based on that testimony, cannot stand up. We accept it as a fact that the Board members consciously believed, when they testified, that the Attorney General's statements amounted to no more than a calendar order (i.e., a direction to give preference, merely in point of time, to consideration and decision of such cases), and that, beyond that, those statements did not have any effect on the Board's decisions. But it is incredible, human nature being what it normally is, that the Attorney General's statements-- as interpreted by the Supreme Court and the former Attorney General-- did not unconsciously influence the Board members so that they felt obliged not to exercise their discretion and, without doing so, to decide against Accardi. Any other finding involves reliance on so remarkable a degree of improbability as to be untenable.
 
 
 17
 Yet the rejection of the finding does not imply any challenge of the intelligence or integrity of the Board members. One need not turn to the works of Freud and his disciples to learn that unconscious influences importantly affect the memory of honest men; such teachings will be found in the writings of Plato, Aristotle, Euripides, Dante, Montaigne, Shakespeare, Moliere, Pascal, Pope, Byron, Dr. Oliver Wendell Holmes and his sagacious son, to say nothing of novels since Fielding to the present. Indeed, the courts have long recognized that, stimulated by interest, pride or other motives, thoroughly honest and intelligent witnesses may tell unbelievable stories. The books are full of comments like these: 'No class of men know better than judges how much interest may unconsciously warp an honest mind.'4A 'Our memories are easy, and ofttimes unconscious, slaves to our wills.'4B Accordingly, a court may discredit the testimony of a witness 'without casting any shade of doubt upon his character.'4C 'The statements of some are unconsciously affected by their wishes, hopes, or prejudices.'4D Judges have spoken of the 'ease with which honest witnesses can persuade themselves that they remember some bygone circumstance which they are ingeniously induced to think that they remember';4E of 'how extremely prone persons are to believe what they wish.'4F Because of interest, 'very honest persons (such is the infirmity of our nature) often deceive themselves without being aware of it'; they 'will often give false color to a transaction, without * * * intending to speak falsely or to suppress the truth.'4G The judiciary has thus acknowledged the wisdom of the aphorism: 'Memory says, 'I did this'; pride says, 'I could not have done it'; eventually pride wins.'
 
 
 18
 The courts, too, have often held that a highly improbable story requires 'strong corroboration,'4H and that 'inherently improbable' testimony, not adequately explained, should be disregarded.4I 'The circumstances of a case may be such as to make' evidence 'utterly incredible, although there are confident attestations in support of it,' said Lord Stowell.4J A court, remarked Judge Learned Hand, is not obliged to close its eyes 'and assume a credulity which no sensible man can * * *.'4K Evidence, as to human conduct, contrary to common experience, will not be accepted.4L The 'eye of the law' will not 'be blinded' by incredible statements,4M statements 'beyond the pale of credibility.'4N 'The measure of proof required to establish any proposition must necessarily vary with its degree of probability',4O and must be strong in proportion to the degree of improbability.4P
 
 
 19
 Pertinent here is the following: In its opinion, issued on April 3, 1953, the Board said:
 
 
 20
 'Affidavits of persons well acquainted with the alien, character investigations by the Service and the testimony of four witnesses placed in this proceeding establish that the alien is considered a person of good moral character.'
 
 
 21
 In a 'press release' issued that same day, the Attorney General announced
 
 
 22
 'that the Board of Immigration Appeals has sustained the order of the Immigration and Naturalization Service to deport Joseph Accardi, 43, of Newark, New Jersey. The order charges that he entered the United States at Buffalo, New York, August 19, 1932, without the required immigration visa.
 
 
 23
 'Accardi, known as a New Jersey racketeer, is a native of Sicily, Italy, and brother of Samuel Accardi against whom denaturalization proceedings are pending in the Federal court at Newark. * * *
 
 
 24
 'These actions were taken under the current denaturalization and deportation program of Attorney General Brownell against top racketeers and subversives. They are the result of closely coordinated action and intensive investigation by the Federal Bureau of Investigation and the Immigration and Naturalization Service.'
 
 
 25
 We have in mind, too, the Supreme Court's remarks that this Board is not an independent agency-- like the Interstate Commerce Commission or the Securities and Exchange Commission-- but a 'non-statutory board composed of subordinates within a department headed by the individual who formulated, announced, and circulated such views of the pending proceedings' and that it 'would be naive to expect such a heavy handed way of doing things' as an explicit order by the Attorney General to the Board to deny the discretionary relief of suspension of deportation to any alien designated by him.
 
 
 26
 We conclude, therefore, that the Board members, in deciding against Accardi's application for such discretionary relief-- i.e., suspension of deportation-- were controlled by what amounted to an order from their superior so to decide. The trial judge's finding is 'clearly erroneous,' since, 'although there is evidence to support it,' we are 'left with the definite and firm conviction that a mistake has been committed.' United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; United States v. Oregon State Medical Society, 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978; McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6.
 
 
 27
 9. To round out the story, it should be noted that the government advances these arguments:(a) The Attorney General, under the regulations, may reverse any Board decision; therefore, says the government, it is absurd to believe that he gave the Board orders directing how they were to decide any particular cases. The government made this same contention in its brief in the Supreme Court.[5] As this argument did not persuade that Court, we do not consider it.
 
 
 28
 (b) In several instances, says the government, the Board has granted discretionary relief to aliens whom the Attorney General had previously named as within the 'program.' This argument, also the government made unpersuasively in its brief in the Supreme Court.[6] We may add that there is no evidence that, in those cases, the Attorney General had not withdrawn the names of those aliens from his 'program before the Board decided in their favor.' Moreover, the Board's chairman significantly testified at the trial that, in every instance where a final decision has been rendered in a case within the 'program,' the alien was ordered to leave the country voluntarily or to be deported, and that none of such persons was granted suspension of deportation.
 
 
 29
 10. The Attorney General, on April 23, 1954, a few days after the Supreme Court's decision came down, issued instructions that the Board should not be influenced in its decisions by his 'program' but, in each case, should exercise independent judgment.
 
 
 30
 11. Accardi must be released from custody unless, within a reasonable time, the Board, under those new instructions, holds a new hearing and renders a new decision on his application for discretionary relief.[7] Although the Board has already found that he has a good moral character, he should have the opportunity at the new hearing to offer evidence that he is not and never has been a racketeer. For it may be that, in so characterizing Accardi, the Attorney General has confused him with someone else of the same name.
 
 
 31
 Reversed and remanded.
 
 APPENDIX
 
 32
 Press Reports and Press 'Releases'
 
 
 33
 (ILLUSTRATION OMITTED)'For Immediate Release
 
 Friday, April 3, 1953
 
 34
 'Department of Justice
 
 
 35
 'Attorney General Herbert Brownell, Jr., announced today that the Board of Immigration Appeals has sustained the order of the Immigration and Naturalization Service to deport Joseph Accardi, 43, of Newark, New Jersey. The order charges that he entered the United States at Buffalo, New York, August 19, 1932, without the required immigration visa.
 
 
 36
 'Accardi, known as a New Jersey racketeer, is a native of Sicily, Italy, and brother of Samuel Accardi against whom denaturalization proceedings are pending in the Federal Court at Newark.'
 
 
 37
 'For Release to Morning Papers of Wednesday, May 20, 1953
 
 
 38
 'Address
 
 
 39
 'By
 
 
 40
 'Honorable Herbert Brownell, Jr., 'Attorney General of the United States.
 
 
 41
 '* * * But here are a few examples of the thousands of decisions and actions the Department of Justice may be called to make and take in a single day: * * * to initiate deportation proceedings against undersirables like Joseph Accardi. * * *'
 
 
 42
 'Organized Crime
 
 
 43
 'Its Threat To Business And Government
 
 
 44
 'Address
 
 
 45
 'By
 
 
 46
 'Warren Olney III
 
 
 47
 'Assistant Attorney General of the United States
 
 
 48
 'Friday, October 30, 1953.
 
 
 49
 'The second area is one in which the Department of Justice has not only primary but exclusive jurisdiction-- the field of denaturalizing and deporting gangsters and racketeers, who are foreign-born and who, because of their criminal activities, can make no claim to remain in the United States while violating its laws. * * *
 
 
 50
 'To name but a few of the nationally known hoodlums who are the objects of the program-- Spinella from Florida and De Simone from Missouri have been deported-- Nicolo Impostato of Kansas City, Jack Dragna of Los Angeles, Joe Accardi of New York and Joe Adonis of New York have all been ordered deported. * * *'
 
 
 51
 'For Immediate Release
 
 
 52
 'Friday, May 8, 1953
 
 
 53
 'Department of Justice
 
 
 54
 'Attorney General Herbert Brownell, Jr. announced today that a petition seeking cancellation of the naturalization of Gaetano Martino, Brooklyn, New York, has been filed in the U.S. District Court of Brooklyn.
 
 
 55
 'The move was another step in the program for denaturalization and/or deportation of racketeers and others who have engaged in criminal activities.'
 
 
 56
 CLARK, Chief Judge (concurring in the result).
 
 
 57
 I concur in the result reached in the majority opinion, but do not feel it necessary to explore, as it does, the underlying motivation of the Board members. What the Supreme Court required the relator to prove he has now adequately demonstrated; namely, that there was a list as alleged, that he was on it, and that this fact was known to the Board. I do not believe that the Supreme Court required us to go beyond this to speculate about the effect of this knowledge on the exercise of the Board's discretion. That would surely be a vain task; all judges naturally and honestly believe that they are above bias. But the facts shown create a presumption of bias not overcome by the Board's self-serving declaration to the contrary. This would be so, whether the program was one of expedition or one of deportation, for in either case relator was being singled out as an alien whose imminent departure was deemed desirable by the Attorney General.
 
 
 58
 What, then, should be the proper disposition of this case? The Supreme Court advised thus: 'It petitioner can prove the allegation he should receive a new hearing before the Board without the burden of previous proscription by the list. After the recall or cancellation of the list the Board must rule out any consideration thereof and in arriving at its decision exercise its own independent discretion, after a fair hearing, which is nothing more than what the regulations accord petitioner as a right.' 347 U.S. 260, 268, 74 S.Ct. 499, 504, 98 L.Ed. 681. I am not convinced that the Attorney General's instructions of April 23, 1954, constituted a withdrawal of the list. Since we cannot effectively control the Attorney General in the administration of his office, we can require only that at a new hearing relator should at least have the opportunity to present evidence rebutting the Attorney General's characterization of him as a racketeer.
 
 
 59
 HARLAN, Circuit Judge (dissenting).
 
 
 60
 I am unable to agree with the result reached by my brethren in this case. I read the majority opinion in the Supreme Court as holding that the issue on which the relator was entitled to a hearing before the Court was whether the Board's denial of discretionary relief represented its own untrammelled decision or one dictated by the Attorney General. Mr. Justice CLARK said: 'It is important to emphasize that we are not here reviewing and reversing the manner in which discretion was exercised. * * * Rather, we object to the Board's alleged failure to exercise its own discretion * * *.' (Italics in original.) The language in the preceding paragraph of Justice CLARK'S opinion means no more, I think, than that the relator's allegations sufficiently charged 'dictation' by the Attorney General, and not that the acts alleged, if proved, necessarily resulted in dictation.
 
 
 61
 The relator has had his hearing on this issue and the trial Judge has found that the Board members 'reached their individual and collective decision on the merits, free from any dictation or suggestion by the Attorney General or any of his assistants or anyone else acting or purporting to act for him.' That finding is supported by the sworn and unequivocal testimony of the Board members who sat on Accardi's case-- the Chairman testifying in person and the others by deposition-- and I cannot regard the finding as 'clearly erroneous.' Nor can I agree with Judge CLARK who holds, as I understand his concurring opinion, that we may accept the finding but side-step its effect. Such a result can be achieved only by giving the Supreme Court's opinion an interpretation which I do not think it will bear.
 
 
 62
 In my view, the dismissal of the writ should be sustained.
 
 
 
 *
 Now 8 U.S.C.A. 1254(a)(1)
 
 
 [1]
 The following are excerpts from that brief:
 Petitioner's 'case rests entirely upon the fact that officials of the Department of Justice have (1) performed their duty to bring deportation proceedings against aliens residing here illegally, (2) expedited cases of aliens deemed to be particularly undesirable, (3) believed petitioner to belong to this class, and (4) made public statements describing these activities. * * *'
 'There is nothing extraordinary, therefore, in the fact that efforts should be made by the Department of Justice to expedite proceedings against deportable aliens whose presence here is deemed particularly undesirable. Nor is it surprising that public statements * * * should be made describing these efforts.'
 Other similar cases 'were expedited under the Attorney General's program to insure enforcement of the deportation laws against aliens believed to be especially undesirable.'
 
 
 [2]
 The following are excerpts from his deposition testimony:
 'Q. Were you the Attorney General of the United States on October 2, 1952? A. Yes.
 'Q. Did you hold a press conference in your office in Washington, D.C. on that date? A. I did.
 'Q. Does the official press release of the Department of Justice contain the announcement which you made on that date? A. A copy of the release is here, and it does.
 'Q. Do the news items of October 3, 1952 in the Washington Star, The Washington Post and the New York Times, accurately reflect your statements to the press? A. They do. * * *
 'Q. When Jack Ignatius Dragna was arrested for deportation on December, 8, 1952, the official press release of that day by the Department of Justice said: 'The arrest, * * *, was another step in his denaturalization and deportation program deemed at ridding the nation of undesirable aliens engaged in racketeering and other criminal activities.' A. You can underline that 'undesirable aliens.'
 'Q. Did the aforesaid quotation accurately reflect your program? A. That is right. That reflects accurately my program. * * *
 'Q. At the time of your press conference, according to the newspaper accounts, you had included within your program such persons as Frank Costello, Nicholas Circella, William Lias, Hyman Shomberg, Alfred Polizzi, Harry Voiler and Anthony Volpe. The Government had admitted that Joseph Accardi was within your program. Do you recall whether he was included before or after your announcement of October 2, 1952? A. Joseph Accardi's case was one of the earliest cases submitted, and his case was already on appeal at the time. I think now-- if I am incorrect, you correct me-- Joseph Accardi's case had been heard by the Hearing Commissioner before and prior to October 2, 1952.
 'Q. That is correct. A. But my investigation and the record of Accardi proved him, to my satisfaction, to be racketeer. That is why I put him on there. * * *
 'Q. Attorney General Brownell has stated in press releases that Joseph Accardi is a racketeer. Do you recall whether he was included within your program because you or your staff considered him to be a racketeer? A. He was one of the first. * * * My investigation of Accardi indicated that he was a racketeer and that is the reason I moved to deport him.'
 
 
 [3]
 The Board consists of five members
 
 
 [4]
 His pertinent findings read as follows:
 'The purpose of the notification, and it was so understood by the Board, was merely to indicate that the Attorney General desired expeditious consideration and determination of the appeal. Neither such notification nor the existence of the program was considered by the Chairman or by any Board member as a direction by the Attorney General, or even as a hint by him, to decide an appeal adversely to an alien. Moreover, these matters were given no weight by the Board in their deliberations. * * * The Board members, and each of them who considered Accardi's appeal, reached their individual and collective decision on the merits, free from any dictation or suggestion by the Attorney General or any of his assistants or anyone else acting or purporting to act for him.'
 4A Grant v. Bradstreet, 87 Me. 583, 609, 33 A. 165, 173.
 4B Thomas v. Ribble, 2 Va.Dec. 321, 24 S.E. 241, 245.
 4C Fisler v. Porch, 10 N.J.Eq. 243, 245.
 4D United States v. Flint, 25 Fed.Cas. pages 1107, 1111, No. 15,121.
 4E Hershey v. Blackesley, 2 Cir., 33 F. 922, 924.
 4F Crouch v. Hooper, 16 Beav. 182, 185.
 4G Marsh v. Tyrrell, 4 Eng.Ecc. 33, 46.
 See also Vreeland v. Vreeland, 48 N.J.Eq. 56, 21 A. 627, 630; Rogers v. Rogers, 97 Md. 573, 55 A. 450, 456; Thayer v. Hart, 2 Cir., 20 F. 693; Hunter v. Wetsell, 84 N.Y. 549, 556.
 4H Moore, Facts (1898) §§ 93, 1146; Smith v. Davis, C.C., 34 F. 783, 784; cf. The William Gray, 29 Fed.Cas. pages 1300, 1302, No. 17,694.
 4I Quock Ting v. United States, 140 U.S. 417, 420, 11 S.Ct. 733, 35 L.Ed. 501; Gindorff v. Prince, 2 Cir., 189 F.2d 897; The Dauntless, 9 Cir., 129 F. 715, 721; Fire Association of Philadelphia v. Weathered, 5 Cir., 54 F.2d 779; Emanuel v. Kansas City T. & Tr. Co., 8 Cir., 127 F.2d 175, 180; Moore, loc. cit. § 137.
 4J The Argo, 1 C.Rob. 158, 159, quoted in Moore, loc. cit. s140.
 4K Ramopa Company v. A. Gastun & Co., D.C.S.D., 278 F. 557, 559.
 4L Gardner v. Gardner, 2 A.C. 723, 730, 736; Earle v. Norfolk, etc. Hosiery Co., 36 N.J.Eq. 188, 194; New York & Brooklyn Ferry Co. v. Moore, 102 N.y. 667, 6 N.E. 293, 298; Vreeland v. Vreeland, 48 N.J.Eq. 56, 21 A. 627, 631; Whelen v. Osgoodby, 62 N.J.Eq. 571, 50 A. 692, 694; Gardner v. Weston, 18 Iowa 533, 535; Hunter v. New York O. & W.R. Co., 116 N.Y. 615, 23 N.E. 9, 6 L.R.A. 246; Gurley v. Missouri Pac. R. Co., 104 Mo. 211, 16 S.W. 11, 17; Groth v. Thomann, 110 Wis. 488, 86 N.W. 178, 181.
 4M Hook v. Missouri Pacific Ry. Co., 162 Mo. 569, 63 S.W. 360, 362.
 4N Kramme v. The New England, 14 Fed.Cas. pages 852, 853, No. 7,930.
 4O Haworth v. Stark, 2 Cir., 88 F. 512, 514.
 4P Murray v. White, D.C., 9 F. 562, 564; The Gratitude v. Eutaw, D.C., 14 F. 479, 481; The El Dorado, D.C., 27 F. 762, 763; Smith v. Davis, C.C., 34 F. 783, 787; Merritt & Chapman D. & W. Co. v. North German Lloyd, D.C., 120 F. 17, 27; Morison v. Dominion National Bank, 169 Va. 191, 192 S.E. 707, 711; Moore, loc. cit. § 32.
 Those more impressed by Latin than English or American, are referred to the maxim, 'In obscuris inspici solere quod verismilius est, aut quod plerumque fieri solet.'
 
 
 [5]
 In its Supreme Court brief, the government said: 'It would be a starting thing indeed * * * to suggest that the Attorney General found it necessary to dictate the Board's decision to spare himself the possible task of reversing a determination with which he disagreed. * * * The short answer again is that both functions-- the prosecution of deportation cases and decision on applications for discretionary relief-- have been entrusted to the Attorney General. The fact that he performed the first is no ground for launching an inquiry into his performance of the second.'
 
 
 [6]
 In its Supreme Court brief, the Government said: In some cases which were 'expedited' under the Attorney General's program, the 'Board of Immigration Appeals has affirmed orders granting' discretionary relief. 'In other cases, following orders for deportation, the Board has ordered the proceedings reopened to consider further applications' for such relief. 'These instances * * * illustrate that decisions in the Department of Justice to commence deportation proceedings are neither decisions in advance on deportability nor judgments in advance on the propriety of discretionary relief.'
 
 
 [7]
 Cf. Mastrapasqua v. Shaughnessy, 2 Cir., 180 F.2d 999, 1003-1004